WELLS, Administrator, Appellant, vs. TOWN OF REMINGTON,
Respondent.

*June 1—July 3, 1904.*

*Highways: Injuries from defects: Negligence: Ordinary care: Evi-*
*dence: Contributory negligence: Court and jury: Statutes: Re-*
*peal as affecting accrued rights of action: Action by parent*
*for death of child.*

1. In an action by an administrator for the death of a minor al-
leged to have been caused by an insufficiency or want of repair
of a highway, the evidence, stated in the opinion, reviewed,
and *held* although there was a safe way for travel which
might have been taken, the town was not relieved from the
exercise of ordinary care in preventing a traveler from going
upon a side track, connected with the main track and appar-

ently safe, but which the town authorities knew or ought to have known, to be unsafe.

2. To render a town liable for injury by reason of a defective highway, the object or defect causing the injury need not be within the traveled track, provided it is so connected with the traveled track as to render the same unsafe and inconvenient to those traveling thereon.

3. When the question of contributory negligence depends on facts from which conflicting inferences can be drawn the question is properly for the jury.

4. Under the provisions of sec. 4974, Stats. 1898 (providing that the repeal of a statute shall not remit, defeat or impair any right of action accrued under such statute before the repeal thereof, whether or not in course of prosecution or action at the time of such repeal, but that all such rights of action created or founded by such statute, liability wherefor shall have been incurred before the time of such repeal, shall be preserved and remain in force notwithstanding such repeal, unless specially and expressly remitted, abrogated or done away with by the repealing statute), ch. 305, Laws of 1899, amending sec. 1339, Stats. 1898 (by providing "that no action shall be maintained . . . by a parent on account of injuries received by a minor child," and that such amendment shall take effect "from and after its passage and publication"), does not take away the right of a parent to maintain an action for the death of a minor child happening through the insufficiency or want of repair of a highway, which occurred two years before the passage and publication of such amendment of sec. 1339.

APPEAL from a judgment of the circuit court for Wood county: CHAS. M. WEBB, Circuit Judge. *Reversed.*

This action was commenced June 19, 1899, to recover damages for the death of the plaintiff's intestate, caused by an alleged defect in the public highway, July 7, 1897. The defendant answered by way of admissions, denials, and counter allegations, and also alleged that the right of action was barred by the statute. Sec. 1339, Stats. 1898, as amended by ch. 305, Laws of 1899. At the close of the testimony the defendant moved the court to direct a verdict in favor of the defendant on four separate grounds, three of which were overruled by the court; and to each of such rulings the defendant

excepted, and urges the same in support of the judgment on this appeal. The court granted the motion on the other ground stated, and from the judgment entered upon the verdict directed in favor of the defendant the plaintiff brings this appeal.

*B. R. Goggins,* for the appellant.

*Geo. L. Williams,* for the respondent.

CASSODAY, C. J. The trial court directed a verdict in favor of the defendant on the sole ground that there was no evidence tending to prove that the alleged defect was within the public highway. To determine the correctness of this ruling, it is important to know the character of the defect and its location in respect to what was then the traveled portion of the highway, or the portion of the highway which was in a condition to invite travel, under the circumstances. It is undisputed that at the place in question the highway ran in a northerly and southerly direction, and was four or five rods wide, and fenced on both sides. It was crossed by Two-Mile creek, which was from two to four feet wide, and entered the highway from the east, flowing thence southerly, thence westerly, thence northwesterly, and thence in a westerly direction, in the form of a curve, to and through an embankment or dike leading across the valley. The creek valley was sandy, with much surface, flat, and from six to ten rods wide from north to south, and from five to six feet lower than the general level outside of it. For many years immediately before the time in question, the highway across the valley ran on the embankment or dike mentioned, the top of which was some five or six feet higher than the bottom of the valley. This dike was from fourteen to twenty feet wide at the top, and from twenty to twenty-four feet wide at the bottom, and as it came from the south, curved to the west until it reached the limit of the highway, and at that point there was a bridge sixteen feet wide and from sixteen to eighteen feet long, cross-

ing the creek, and from thence the dike ran directly north.. As stated by the trial court, the dike "was reasonably safe for travel prior to the 28th or 29th of June, 1897, when an unusual flood carried off the bridge and covered the entire lowlands between the extreme banks described—some six to ten or twelve rods in width—with water to a depth of some three feet in most or all of that part of the highway." As early as, or earlier than, July 1, 1897, the flood carried away the bridge, leaving a break in the embankment of about forty feet, and so made or created a hole in the ground over which the bridge had been—extending eastward of the embankment some twenty feet, and being from ten to twelve feet or more in depth, and nine feet deep at its most easterly edge, on July 7, 1897. There was no more rain after June 30, 1897, and the water subsided rapidly. On the evening of the day on which the bridge went out, a fence was placed clear across the highway, on both sides of the creek, to prevent travel. The next day such fences were removed, except across the embankment, and the highway was thus open to travel, and from that time on teams passed north and south in large numbers, especially on the 4th day of July.

There is evidence tending to prove that the road commissioner for the previous year was at the *locus in quo* a day or two after the bridge went out, and after the water had gone down a depth of three feet on the general level, and with a pole sixteen to twenty feet in length probed the hole from the south end of the dike, at the break therein, and found it to be from thirteen to fourteen feet in depth; that teams were crossing at the time, and he reported these conditions to the town board; that he was there again on the morning of July 7, 1897, the day of the accident, and probed the hole again, but at no time sought to find how far the hole extended toward the east; that the valley had water over its surface until July 5, 1897, when there appeared a tongue or narrow strip of land, extending from the north bank of the valley to

the creek at the south, and right up to the large' hole; that July 6, 1897, this dry strip was continuous from the north, except a little dead water near the north side of the valley; that on that same day some poles were placed across the creek, at a point where their north ends were about twelve feet southeast of the big hole; that on that day teams were crossing on such dry strip of land, going on the west side of the poles mentioned; that the dry strip had been covered with grass, but was mostly washed over with sand by the flood; that July 7, 1897, this dry strip of land, opposite the big hole, was about nine feet wide, and came right up close to the big hole (this did not include the dip in the overhanging sod, which had been undermined and had been covered by water, the body of the hole really extending under the edge of the dry strip); that directly east from the big hole, and nine or ten feet from it, was a mire hole, where several travelers had trouble; that there were wheel tracks—wagon tracks—along the dry strip of land for some time before the accident. It appears and is undisputed that previous to the flood, and while the bridge was in place across the creek, there had been for a long time a passageway or fording place, called the "main ford," which was used regularly by a large portion of the traveling public. That ford left the embankment several feet south of the south bend of the creek, and then went first in a northeasterly direction, and then curved toward the north, and crossed the creek at its southern bend, and then went in a northerly direction, and finally curved toward the west and entered the regular highway over the embankment. After the bridge went out and the fences which prevented travel were removed, the public resumed travel on the main ford, which, on the day of the accident, was covered with water for about three rods immediately north of the creek.

The plaintiff's intestate was a little more than seventeen years of age at the time of his death. He resided with his parents, eight and one-half miles northerly from the place of

the accident. On the morning of July 7, 1897, he left his home in good health, with a two-wheeled cart drawn by a horse or pony, destined to Mr. Winter's place, about one mile south of the place in question. There is evidence tending to prove that, in going south, he drove on the dry strip of land described, and that on his way home he started to drive over that same dry strip of land, between the poles mentioned and the deep hole. There is evidence tending to prove that a short time after one o'clock in the afternoon of July 7, 1897, a little boy discovered a boy's hat floating on the surface of the water in the big hole, and a horse's foot sticking up out of the water; that he gave the alarm, and the people in the vicinity came and found the horse or pony right on his back in the deep hole, and the cart bottom side up in the water, and the boy right under the cart, and the umbrella under the boy and farthest down; that the horse was still connected with the cart—the tugs hitched, and the pony checked up; that there was a short mark over the boy's left eye and temple, and a black spot on the left side of his neck, his pants were torn in two or three places, two lifts were off the left shoe heel, two slats of the floor of the cart and one thill were cracked or broken, and his hat was floating on the east edge of the hole— six or seven feet from the foot of the horse and about the same distance from the shore.

Such is a general outline of the evidence upon which the court directed a verdict in favor of the defendant. In doing so, the learned trial judge laid particular stress upon the fact that during all the time after the fences which prevented travel were removed, down to the time of the accident, there was a passageway (at the place in question) along which persons could pass with reasonable safety, and that there were no facts which would justify a finding that the town author- ities ought to have foreseen that any traveler, in the exercise of ordinary care, was liable to wander up to the margin of the hole, several feet outside of any track or any way thereto-

fore used, or so near it as to be liable to fall into it. It is true that the "main ford"—so called—was a reasonably safe passageway at the time; but there is evidence tending to prove that such "main ford" was, at the time, covered with water for a distance of three rods immediately north of the creek. A stranger to the situation would not know, without testing it, whether such "main ford"—so covered with water—was free from holes and safe or not. At the same time, it is undisputed that there was a dry strip of land, extending from a point south of the creek to the north, between the poles mentioned and the deep hole, to the regular highway over the embankment, except that at the north end of such dry strip there was a little dead water; and in driving upon such dry strip it was, of course, necessary to cross the creek. There is evidence tending to prove that the town authorities knew, or ought to have known, the whole situation as it existed July 7, 1897. This being so, can it be said, as a matter of law, that the town authorities were justified in not foreseeing that a traveler might, in the exercise of ordinary care, drive upon the dry strip of land, instead of the "main ford," thus covered with water? There is evidence tending to prove that the dry strip of land was well calculated to invite travel, under the circumstances. It was apparently nine feet wide in the narrowest place. There is evidence that the water in the big hole was dark and roily. A stranger might not know that it was any deeper than the water covering the "main ford." The depth of the deep hole and the overhanging sod made it, especially, a question for the jury to determine whether it was defective or reasonably safe. There is evidence tending to prove that teams had been driven over that dry strip of land for some time prior to the accident. The mere fact that there was a safe way, which might have been taken, did not relieve the defendant from the exercise of ordinary care in preventing travelers from going upon a side track, connected with the main track and apparently safe, but which the town

authorities knew, or ought to have known, to be unsafe. This is illustrated by numerous adjudications in this court. A few only are cited: *Cartright v. Belmont,* 58 Wis. 370, 17 N. W. 237; *Wiltse v. Tilden,* 77 Wis. 152, 46 N. W. 234; *Schuenke v. Pine River,* 84 Wis. 669, 54 N. W. 1007; *Bills v. Kaukauna,* 94 Wis. 310, 68 N. W. 992. "To render a town liable for injury by reason of a defective highway, the object or defect causing the injury need not be within the traveled track, provided it is so connected with the traveled track as to render the same unsafe and inconvenient to those traveling thereon." *Slivitski v. Wein,* 93 Wis. 460–462, 67 N. W. 730, and cases there cited; *Carpenter v. Rolling,* 107 Wis. 559, 563, 83 N. W. 953.

2. The trial court very properly held that the question whether the deceased was guilty of contributory negligence was peculiarly one for the jury. It is claimed on the part of the defendant that it appears from the evidence that the deceased followed the creek, and drove with his near wheel in the creek and his off wheel on the shore, directly northwest, and headlong into the deep hole. The plaintiff contends that the evidence shows that he drove upon the dry strip of land between the poles mentioned and the deep hole, and that the cart slid off the overhanging sod and threw the pony into the deep hole, and that that accounts for the situation in which the cart, the pony, the boy, and the umbrella were found in the deep hole. Such questions and others were properly for the jury.

3. It is claimed that the plaintiff's right of action was taken away by ch. 305, Laws of 1899, which amended sec. 1339, Stats. 1898, by providing "that no action shall be maintained . . . by a parent on account of injuries received by a minor child." That chapter provides that it should "take effect and be in force from and after its passage and publication," which was nearly two years after the right of action, if any, accrued. Such statute is by its terms pros-

pective.   Besides, the general statutes provide in effect that the repeal of a statute "shall not remit, defeat or impair any . . . right of action accrued under such statute before the repeal thereof, whether or not in course of prosecution or action at the time of such repeal," but that "all such . . . rights of action created by or founded on such statute, liability wherefor shall have been incurred before the time of such repeal thereof, shall be preserved and remain in force notwithstanding such repeal, unless specially and expressly remitted, abrogated or done away with by the repealing statute."   Sec. 4974, Stats. 1898.   The case comes squarely within the repeated rulings of this court.   *Pier v. Oneida Co.* 102 Wis. 338, 78 N. W. 410; *H. W. Wright L. Co. v. Hixon,* 105 Wis. 153, 80 N. W. 1110, 1135; *Mauch v. Hartford,* 112 Wis. 40, 47, 87 N. W. 816.   See *Mueller v. Milwaukee,* 110 Wis. 623, 86 N. W. 162.   The trial court properly held that the alleged cause of action was not taken away by the statute cited.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded for a new trial.