# CASES DETERMINED

# August Term, 1913.

CITY OF SUPERIOR, Appellant, vs. ROEMER and others, Respondents.

*January 10—October 7, 1913.*

*Municipal corporations: Viaducts over railroads: At whose expense to be constructed: Charter provisions: Ordinance contracts: Consideration: Police power: Crossing of old way by new one: Right to use street for switching: Railroad Commission: Authority to apportion expense of crossings: Statutes: Repeal of charter provision: Effect on existing causes of action: Submission to jurisdiction of Commission: Waiver.*

1. A dispute, without substantial foundation, between a city and a railway company, as to whether a street crossed by the company's tracks was legally laid out and used as a public highway prior to the acquisition of any rights by the company, affords no basis of consideration for an ordinance whereby the city undertakes to assume a part of the expense of constructing a viaduct over such tracks.

2. A provision in a city charter giving to the common council power "to require railroad companies to construct and maintain at their own expense such bridges, gates, viaducts, tunnels, approaches or other conveniences at all public crossings of streets . . . as may be necessary," where no other authority in respect to such matters is conferred upon the city, amounts to a prohibition against the city's building or paying any part of the expense of a viaduct.

3. For this reason the temporary use by the city of part of the right of way of a railway company, at its intersection with a public street, for building an approach to a viaduct over the adjoining tracks of another railway company, is not a sufficient consideration to support an ordinance contract whereby the city agrees that at such time after three years as the rail-

way company shall elect to continue such viaduct over its own tracks, the city will at its sole cost and expense construct the necessary approaches, abutments, and supports for the same and remove the approach to the former viaduct so constructed by it in the public street.

4. As between the railroad and the street, the railroad was the new way, and the construction of the new way over the old way having caused the necessity for a viaduct, the railway company was bound at common law to build it, and no part of the burden would properly fall upon the city under the police power, unless some part of the expense was produced by other causes falling within such police power and properly chargeable to the city.

5. A city cannot by ordinance or contract barter away or surrender the police power or tie its hands in the future in respect to the proper exercise of its governmental functions, even if such ordinance or contract is supported by a valid consideration.

6. Even if sec. 1836, Stats., which requires every railway company occupying a public street to restore such street to its former condition of usefulness and maintain the same in such condition, is not strictly applicable to viaducts and subways, yet, taken in connection with a charter provision authorizing the common council of a city to require railroad companies to construct them when necessary, it is significant in determining upon whom the burden of such construction should rest where an old way is crossed by a new way.

7. Where a railway company located its switch tracks and part of its yard for storage and handling of cars and making up trains on a public street, thereby creating the necessity for a viaduct, the city would have a right under the police power to require one to be constructed.

8. In the passage of ordinances relating to viaducts in the public streets over railway tracks, a city acts within its governmental power, and it cannot surrender or alienate a strictly governmental power which the public welfare requires should continue.

[9. Whether the statutes giving railway companies the right to occupy public streets, subject to conditions, authorize the use of such streets for switching tracks and yards, not determined.]

10. *It seems* that ch. 540, Laws of 1909, as amended by ch. 191, Laws of 1911, which confers certain powers upon the Railroad Commission respecting changes in highway crossings and the apportionment of the expense of such changes, was intended to inaugurate a new and uniform state policy with reference to such matters, and to repeal all conflicting charter provisions;

but it did not and could not have any effect upon a right of action which had accrued in favor of a city prior to its passage.

11. Where the common council of a city, pursuant to authority conferred by its charter, had, prior to the passage of said ch. 540, Laws of 1909, taken action by resolution requiring certain railway companies to construct a viaduct over their tracks at a public street crossing, and had served such resolution upon the railway companies, a right and cause of action thereby accrued in favor of the city to compel the construction of such viaduct at the expense of the railway companies, which was not cut off by said act, even if that had the effect of repealing the charter provision on the subject.

12. The fact that the city submitted to the jurisdiction of the Railroad Commission, by petitioning it under the act of 1909, to order the construction of the viaduct and *apportion the cost among the railway companies affected*, where the allegations of the petition showed that the cause of action existed prior to the passage of that act, did not constitute a waiver of any of its rights; and under such petition the Railroad Commission had authority to apportion the cost to the several railway companies as prayed, but had no power to assess any portion of the expense against the city.

BARNES, J., and WINSLOW, C. J., dissent.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Reversed.*

This action was commenced in Dane county circuit court under sec. 1797—16, Stats., to review the proceedings had before the *Railroad Commission of Wisconsin* and vacate, set aside, and alter that portion of the order of the *Railroad Commission* providing that the city of *Superior,* appellant, pay twenty per cent. of the cost of construction of the viaduct and approach over the railroad companies' yards and tracks on Belknap street in *Superior,* and to relieve the city of *Superior* from paying any of the cost of the viaduct or damages to property.

The court made the following findings:

"1. That Belknap street crosses the tracks of all of defendant railway companies in the city of *Superior* at grade.

"2. That in January, 1910, the plaintiff city began a proceeding before the *Railroad Commission of Wisconsin* under sec. 1797—12e of the Statutes to compel the defendant railway companies to construct a viaduct over their tracks where the same are crossed by Belknap street; that thereafter the said *Commission* made an order directing the construction of such a viaduct and apportioning the expense of constructing the same; that said order provided that the plaintiff city should pay twenty per cent. of such cost.

"3. That the charter of the plaintiff city, passed by the legislature in 1889, provided that the city 'shall have authority . . . to require the railroad companies to construct and maintain at their own expense . . . viaducts . . . as may be necessary.' That the plaintiff city has never taken any action under said charter to compel the building of a viaduct over the tracks of the defendant railway companies on Belknap street before January, 1910.

"4. That in 1895 the plaintiff city passed an ordinance providing for the construction of a viaduct on Belknap street over the tracks of the Great Northern Railway Company which lie adjacent to the tracks of the *Northern Pacific Railway Company;* that during said year of 1895 an ordinance was also passed which authorized the *Northern Pacific Railway Company* to continue such viaduct over its tracks adjacent to the right of way of the Great Northern Railway Company in Belknap street at any time after three years from the date of the passage of such ordinance; that said ordinance contained an agreement on the part of the *Northern Pacific Railway Company* to permit the city to build an approach to the viaduct over the tracks of the Great Northern Railway Company in Belknap street where the same passed through lands owned by the *Northern Pacific Railway Company,* without any claim for damages on the part of the *Northern Pacific Railway Company;* that in said ordinance the city of *Superior* agreed that, in case the *Northern Pacific Railway Company* constructed a viaduct over its tracks on Belknap street, the said city would at its sole cost and expense construct the necessary approaches for said viaduct and the necessary abutments or supports for the same, and that it would also remove the approaches to the viaduct over the tracks of the Great Northern Railway Company which it had constructed

in Belknap street where the same passes through lands owned
by the *Northern Pacific Railway Company;* that said ordi-
nance was accepted by the *Northern Pacific Railway Com-
pany,* and became a binding contract between the said city
and the said railway company.

"5. That the order of the *Railroad Commission* appor-
tioning twenty per cent. of the cost of said viaduct to the
city of. *Superior* is a reasonable order.

"6. That said order is not unlawful and that it is not
wholly unwarranted in law."

The court concluded "That the plaintiff's complaint be
dismissed with costs in favor of defendant to be taxed ac-
cording to law."

Judgment was entered dismissing the plaintiff's complaint
with costs, from which this appeal was taken.

For the appellant there was a brief by *H. V. Gard* and
*T. L. McIntosh,* and oral argument by *Mr. McIntosh.*

For the respondent *Northern Pacific Railway Company*
there was a brief by *Hanitch & Hartley,* attorneys, and
*C. W. Bunn* and *Emerson Hadley,* of counsel, and oral argu-
ment by *Russell Jackson,* deputy attorney general, *Louis
Hanitch,* and *J. A. Murphy.*

The following opinion was filed April 8, 1913:

KERWIN, J.   The strip of land occupied by the tracks of
the railway companies, defendants, is about 1,300 or 1,400
feet wide, running north and south at the westerly side of the
business portion of the appellant city, which strip crosses
Belknap street, one of the principal thoroughfares of the ap-
pellant city.   The Great Northern Railway Company, for-
merly the Eastern Railway Company of Minnesota,. owns the
westerly 600 feet of this strip; the *Northern Pacific Railway
Company* owns 600 feet to the east of and adjoining the strip
owned by the Great Northern Railway Company; the *Duluth,
South Shore & Atlantic Railway Company* and the *Lake Su-*

*perior Terminal & Transfer Railway Company* own the balance of the strip at the easterly side.

In December, 1894, the Great Northern Railway Company attempted to enter into an agreement with the appellant for the erection of viaducts on Belknap and other streets, running east and west across defendants' tracks and right of way, and the appellant by ordinance provided that the city, appellant, would build the approaches at the ends of such viaducts, the approach at the east being upon the strip of land occupied by the tracks of the *Northern Pacific Railway Company,* and under the terms of the alleged ordinance the appellant city was to have the use for the approaches of the lands in the streets upon which such approaches were built until the *Northern Pacific Railway Company* might want to use the same.

The ordinance, among other things, provided as obligations upon the city that the city would not at certain points lay out or open any street or highway at grade, and that no grade crossings should be thereafter established across the grounds and right of way of said railway company, except at certain points; that when the safety of the public or passengers or employees of the railway company or the interests of said railway should require it, the city would construct bridges at each of said points named, with the abutments and approaches thereto, and that each of said bridges should have an elevation above the rails of the tracks of the railway at the grade existing when the bridges were constructed so as to give at least twenty-two feet clear between the top of the rails and the lowest member of the bridges from the rails; that should the city open or extend streets within certain limits across the grounds or right of way of the railway company, except at points named, the crossing of said grounds should be an under crossing or bridge, and the city agreed that it would at its own cost construct and maintain necessary approaches, abutments, retaining walls, and

approaches with supports. It was further provided by said ordinance that the city would change the grade of streets, or establish grades so as to make it legal for the railway company to construct bridges at an elevation as provided in the ordinance, and assume all liability for damages to all parties other than the railway company occasioned by or growing out of the change of grade, establishing of grades, or construction of bridges with abutments and approaches, and save the company harmless; that should the appellant city at some future time decide that it was necessary to construct signals or gates or to place watchmen at any points where streets have been or are laid out or opened across the grounds and right of way of said railway company south of Twenty-eighth street, the city would at its own cost construct, maintain, and operate such signals or gates and pay for the services of watchmen, and save the railway company harmless; that the provisions of said ordinance shall constitute a contract between the city and said railway company.

. After the passage of the ordinance for the construction of the Great Northern viaduct and on August 9, 1895, the city council of appellant passed an ordinance which in terms recited the adoption of the ordinance for the construction of the Great Northern viaduct, and among other things authorized the *Northern Pacific Railway Company,* at its election after three years, to construct a bridge or viaduct across its tracks connecting with the viaduct over the tracks of the Great Northern Railway Company so as to extend the Great Northern viaduct over the tracks and property of the *Northern Pacific Railway Company's* right of way, under which ordinance the appellant was authorized without charge to build the approach to the Great Northern viaduct on the right of way of the *Northern Pacific Railway Company* in Belknap street. The ordinance further provided that the appellant agreed to remove such approach at its own expense when the *Northern Pacific Railway Company* should elect to

build a viaduct over its own property, and such company was to give the appellant sixty days' notice of its election, and the appellant under this ordinance agreed that it would at its own expense construct the necessary abutments for the approach to the viaduct and forever maintain and repair such viaduct and assume all liability for damages to all parties other than the railway company occasioned by the construction of the viaduct and approaches, and to change the grade of the street so as to make it legal for said railway company to construct a bridge at an elevation as provided in the ordinance. The *Northern Pacific Railway Company* by the terms of this ordinance agreed that the appellant city might use, for the purpose of locating and constructing an approach to the easterly end of the viaduct then being constructed as required by the ordinance of December, 1894, for the term of three years and until required by said *Northern Pacific Railway Company* to remove the same, part of the right of way of said railway company in Belknap street, provided such approach should not extend more than 300 feet from the east end of said viaduct in Belknap street, and provided further that such approach should not interfere in any manner with the use of the tracks of said railway company then crossing Belknap street, the *Northern Pacific Railway Company* to give the city sixty days' notice to remove. This ordinance was in form accepted by the *Northern Pacific Railway Company*.

In October, 1907, the *Northern Pacific Railway Company* served notice upon the appellant of its election to construct a viaduct on Belknap street under the terms of the ordinance. On November 5, 1907, the appellant passed a resolution requiring all railway companies operating railroads across Belknap street to construct and maintain at their own expense a viaduct across their tracks on said street, together with the necessary approaches. Afterwards and in Decem-

ber, 1908, notice was given to the railroad companies of the passage of this resolution.

On June 26, 1910, the appellant commenced proceedings by petition to the *Railroad Commission of Wisconsin* praying for an order directing the *Northern Pacific Railway Company*, the *Duluth, South Shore & Atlantic Railway Company*, and the *Lake Superior Terminal & Transfer Railway Company* to construct and maintain at their own expense a viaduct over their several tracks where the same cross Belknap street so as to connect with and constitute a continuance of the Great Northern Railway viaduct, with the necessary approaches thereto, and to determine and apportion the cost to be paid by each of said railway companies. The said different companies answered by way of admissions, denials, and special matter. The litigated matters before the *Railroad Commission* between appellant and the railway companies were mainly (1) the necessity of a viaduct; (2) whether Belknap street was a legal highway before the railway companies acquired their rights across it; (3) the apportionment of the cost of the viaduct and damages.

The *Northern Pacific Railway Company* put in evidence the ordinance of August 9, 1895, its acceptance, and the notice of its election to build the viaduct thereunder. The appellant introduced in evidence the resolution of appellant's council of November 5, 1907, requiring the railway companies to build the viaducts and approaches at their own expense and proof of service of such resolution upon the companies and some correspondence relating thereto.

In June, 1911, the *Railroad Commission* filed its decision in which it found that the viaduct was necessary, and that Belknap street had been legally opened and used as a public highway within the limits of the appellant city prior to the acquisition of any right of way by the railway companies or any of them.

On the point as to the priority of Belknap street over the railroads, the appellant put in evidence records of the town of Superior showing that said street had been laid out and traveled as a highway prior to the acquisition of any rights by the railway companies. The *Railroad Commission* also found that there had been a dispute of several years' standing between the appellant and the *Northern Pacific Railway Company* as to whether Belknap street was a public highway prior to the location of the line and tracks of the *Northern Pacific Railway,* and that the ordinance of August 9, 1895, was a compromise of that dispute; the only evidence, however, of any dispute being what appeared by way of recital in the ordinance.

The *Commission* also found that fourteen tracks crossed Belknap street at the point in question, all but two of which were switch tracks, and that switching at that point was very heavy. The *Railroad Commission* apportioned the costs between the various railway companies and the appellant city as follows: the city of *Superior,* twenty per cent.; the *Northern Pacific Railway Company,* fifty per cent.; the *Lake Superior Terminal & Transfer Railway Company,* twenty per cent.; and the *Duluth, South Shore & Atlantic Railway Company,* ten per cent.

By stipulation the case was tried in the court below on the same evidence taken before the *Railroad Commission* and no new evidence was introduced.

Whether the *Railroad Commission* had power to charge twenty per cent., or any amount, upon the appellant city for the construction of the viaduct is the question here. The serious problem in this connection is whether the ordinance passed August 9, 1895, in so far as it purports to impose burdens upon the appellant city, is valid. The respondents contend that it is valid on two grounds: (1) that it was based upon a good consideration; and (2) that, independent of consideration for the ordinance, which purports to be a contract

between the appellant city and the *Northern Pacific Railway Company*, the *Railroad Commission* had power to impose upon the appellant city a part of the cost of the viaduct.

1. A very strenuous effort has been made, not only upon the trial but in proceedings before trial, by the railway companies and the city authorities, to import into the ordinances referred to a consideration. For example, the ordinance of August, 1895, recites the fact that a dispute arose as to priority between the *Northern Pacific Railway Company's* and appellant's occupancy and rights on Belknap street. But there was no evidence offered by the railway companies on the trial before the *Railroad Commission* on this point, and the undisputed evidence shows that Belknap street was legally laid out as a highway and used as such before the respondents, railway companies, or any of them, acquired any right or interest in the land embraced in Belknap street. So it is clear that such pretended right afforded no basis of consideration for the alleged promise on the part of the city to assume any burden occasioned by the construction of the viaduct.

It is further insisted by respondents that the use of the right of way of the *Northern Pacific Railway Company* in Belknap street for approach to the Great Northern viaduct was a sufficient consideration to support the alleged promise on the part of the appellant embraced in the ordinance of August, 1895. This contention is unsound for several reasons. In the first place the city charter permitted the construction of viaducts only at the expense of the railway companies. The provisions of the charter existing at that time on the subject provided:

"To regulate the use of locomotive engines and railroad cars within the city, to direct and control the location of railroad tracks within the streets, to regulate the speed of railway trains within the city, and to require railroad companies to construct and maintain at their own expense, such

bridges, gates, viaducts, tunnels, approaches or other conveniences at all public crossings of streets now laid out, or which may be hereafter laid out, as may be necessary." Laws of 1891, ch. 124, sec. 35, sub. 51.

This provision amounts to a prohibition. Where the charter provides for building at the expense of the railway companies and no other authority is conferred, the city cannot authorize building in the manner prescribed at the city's expense. It could not by indirection defeat the provisions of the charter. A municipal corporation has no power except that expressly conferred or what is necessarily implied from the power conferred. *Flannagan v. Buxton*, 145 Wis. 81, 129 N. W. 642; *Butler v. Milwaukee*, 15 Wis. 493. Surely no power to pay any part of the expense of a viaduct by a city can be implied where the charter provides that such viaduct shall be built by the railway company at its own expense. So it is plain that the city had no power under its charter to assume any burden of the cost of the viaduct.

Was there any duty upon the city to pay any part of the expense under the police power? We think not. Had any portion of the cost of the viaduct been authorized by statute to be imposed upon the appellant, a different question would be presented. The railroad was the new way, and the railroad company was bound, not only by statute but by the rules of the common law, to pay the costs occasioned by the construction of the new way. *Chicago, M. & St. P. R. Co. v. Milwaukee*, 97 Wis. 418, 72 N. W. 1118, and cases there cited; *State ex rel. Northern Pac. R. Co. v. Railroad Commission*, 140 Wis. 145, 121 N. W. 919; *Boston & A. R. Co. v. Cambridge*, 159 Mass. 283, 34 N. E. 382.

The construction of the new way over the old way clearly caused the necessity of the viaduct, therefore the railway company was bound to build it in the absence of statute otherwise distributing the cost. If any part of the expense was not occasioned by the new way, but was produced by

other causes falling within the police power and properly chargeable to the city, such burden might be imposed upon the city. *Chicago, M. & St. P. R. Co. v. Milwaukee, supra; State ex rel. Northern Pac. R. Co. v. Railroad Commission, supra.* But such is not the case here. There is no question of burden imposed against the city under the police power. Both of the above ordinances contain provisions plainly indicating a purpose to barter away by contract or surrender the police power or tie the hands of the city in the future respecting the proper exercise of its governmental functions. This the city could not do.

So in any view of the case the ordinances referred to, in so far as they attempted to impose a burden upon the appellant, are void, without consideration, and afford no justification for a promise by the city in that regard. But, even if the ordinances were supported by a valid consideration, they are void on the ground that they provide for the surrender of governmental powers of the appellant city. *Grand Trunk & W. R. Co. v. South Bend,* 174 Ind. 203, 89 N. E. 885; *Board of Education v. Phillips,* 67 Kan. 549, 73 Pac. 97; *Vandalia R. Co. v. State,* 166 Ind. 219, 76 N. E. 980; *Northern Pac. R. Co. v. State,* 208 U. S. 583, 28 Sup. Ct. 341.

Considerable is said by counsel for respondent in their brief about the public demand and growing necessity for viaducts over and subways under railroads. This is doubtless true, but the question here is not one of necessity of a viaduct. That is not disputed. The question is, Who shall bear the burden? If a city should lay out a new public highway across the switch tracks and yard of a railroad, the city thereby creating the necessity of the viaduct or subway, and there was no statute fixing the burden, there might be some force in the claim that the city should bear the burden or some part of it. But that is not the situation here.

While the statute, sec. 1828, sub. 5, gives a railway company the right to occupy a street, sec. 1836, Stats., requires such railway company to restore the street so occupied, and every highway across, along, or. upon which such railroad may be constructed, to its former state, or to such condition that its usefulness shall not be materially impaired, and thereafter maintain the same in such condition against any effects in any manner produced by such railroad. It is perhaps true that sec. 1836 is not strictly applicable to viaducts and subways, but in connection with the provisions of the city charter quoted it is significant in determining upon whom the burden shall rest in cases like the present, where an old way is occupied by a new way. The railway company being the new way, and the appellant having no authority to order the viaduct constructed except at the expense of the railway company, the alleged ordinances purporting to. put burdens upon the city were void. It was the duty of the Great Northern Railway Company to build its approach when it built its viaduct, and when the *Northern Pacific Railway Company* was ordered to build a viaduct it was its duty to build it at its own expense, and the pretended agreement on the part of the authorities that the city should pay any portion of the expense was without authority of law.

The fact that a part of the right of way of the *Northern Pacific Railway Company* on Belknap street was occupied by the approach under the alleged ordinance is not a consideration sufficient to support the ordinance, because the city had no power to make such agreement, and moreover the city had a right without agreement to occupy any part of Belknap street for an approach to a viaduct when such viaduct was necessary and was ordered built by the appellant. The ordinance does not even require the railway company to build the viaduct, but gives it an option to do so, and, if it elects so to do, the appellant, by the terms of the ordinance, agrees to remove the approach to the Great Northern viaduct

at its own expense and construct the necessary abutments and build the approaches and accept the bridge and approaches as a part of Belknap street, and forever thereafter maintain and repair it with the abutments, supports, and approaches thereto, at the sole cost and expense of the city.

There is no dispute but that the railway company constructed its switch tracks and part of its yard for storage and handling cars and making up trains on Belknap street, and such use obviously made the necessity of a viaduct more imperative. Under the police power the city would have a right to require the construction of a viaduct. *Chicago, M. & St. P. R. Co. v. Fair Oaks,* 140 Wis. 334, 122 N. W. 810; *Chicago, B. & Q. R. Co. v. Nebraska,* 170 U. S. 57, 18 Sup. Ct. 513; *State ex rel. Minneapolis v. St. Paul, M. & M. R. Co.* 98 Minn. 380, 108 N. W. 261; *State ex rel. Minneapolis v. St. Paul, M. & M. R. Co.* 35 Minn. 131, 28 N. W. 3.

In the passage of the ordinance in question the appellant was attempting to act within its governmental power, and it could not surrender or alienate a strictly governmental power which the public welfare requires to continue. *Chicago, M. & St. P. R. Co. v. Milwaukee,* 97 Wis. 418, 72 N. W. 1118; *State ex rel. Minneapolis v. St. Paul, M. & M. R. Co.* 98 Minn. 380, 108 N. W. 261; *State ex rel. Duluth v. N. P. R. Co.* 98 Minn. 429, 108 N. W. 269; *State ex rel. St. Paul v. Minn. T. R. Co.* 80 Minn. 108, 83 N. W. 32; *Rochester v. Rochester R. Co.* 182 N. Y. 99, 74 N. E. 953; *Vandalia R. Co. v. State,* 166 Ind. 219, 76 N. E. 980; *Northern Pac. R. Co. v. State,* 208 U. S. 583, 28 Sup. Ct. 341.

The railway company under the charter being required at its own expense to build the viaduct, the city could not make a valid contract to pay any part of the expense. *State ex rel. R. & W. Comm. v. M. & St. L. R. Co.* 80 Minn. 191, 198, 83 N. W. 60; *State ex rel. Duluth v. N. P. R. Co.* 98 Minn. 429, 108 N. W. 269; *State ex rel. Minneapolis v. St.*

*Paul, M. & M. R. Co.* 98 Minn. 380, 108 N. W. 261; *Northern Pac. R. Co. v. State,* 208 U. S. 583, 28 Sup. Ct. 341.

It is argued by counsel for appellant that there appears no authority for the use of Belknap street for switching yards, storage tracks, and switching tracks; that the statutes giving railway companies the right to occupy streets subject to conditions do not authorize switching tracks or yards such as it appears Belknap street is incumbered with in the instant case,—citing authorities. But we do not deem it necessary to consider or decide the question in the view the court takes of the case.

It will be seen that what has been heretofore said is upon the theory that the provision of the city charter authorizing the appellant to require the railway company to build the viaduct at its own expense governs this case. It is, however, insisted by counsel for respondent that the instant case is controlled by ch. 540, Laws of 1909, as amended by ch. 191, Laws of 1911. The *Railroad Commission* seems to have taken that view of the case. The *Railroad Commission,* after quoting from ch. 540, Laws of 1909 as amended, said:

"Before the enactment of ch. 540 the construction of viaducts and the payment of costs thereof in cities was required or provided for by agreement between the city and the railroads or by the provisions of the city charter."

Said ch. 540 as amended provides, among other things, that whenever a petition is lodged with the *Railroad Commission* by the common council of a city, within or bordering upon which a highway or street crosses or is crossed by a railroad, to the effect that the public safety requires an alteration in such crossing, its approaches, the method of crossing, the location of the highway or crossing, the closing of a highway crossing, and the substitution of another therefor not at grade, or requires the determination of the mode and manner of making such new crossing and praying that the same may be ordered, it shall be the duty of the *Com-*

*mission* to give notice to the proper parties in interest and proceed to investigate the same and order a hearing thereon. The *Commission* shall fix the proportion of cost and expense of the work, including damages to be paid by the railroad company or companies and the municipality or municipalities in interest. The repealing clause in this chapter is as follows:

"All acts or parts of acts conflicting with the provisions of this act or with section 1792—12*d,* or with the exclusive exercise of the jurisdiction herein and hereby conferred, or conferred by section 1797—12*d,* are hereby repealed."

Counsel for respondents argue that ch. 540 was the adoption by the state of a new policy, or rather a uniform policy, by safeguarding railroad crossings by the separation of grades, and that the law applies to every crossing, new or old, in the city or in the country; that it leaves to the *Railroad Commission* the determination of the kind of crossing and the apportionment of the expense among the parties in interest, and that the intention of the legislature to repeal all city charter provisions on the subject and make the law uniform is manifest. There is great force in this contention. Obviously the intention of the legislature in passing ch. 540 of the Laws of 1909 was to provide a certain and specific remedy in all such cases, and this law provides a clear and certain remedy by lodging a petition with the *Railroad Commission* and authorizing such *Commission,* after investigation and hearing, to fix the proportion of cost and expense between the railroads, the municipality, and the state. This law was amended by ch. 191, Laws of 1911, by striking out the words "and the state." So as the law now stands, the cost and expense is to be distributed between the railroads and the municipalities. The whole act in connection with the repealing clause shows quite clearly that the intention was to repeal charter provisions in conflict with the act "or with the exclusive exercise of the jurisdiction" conferred by the act.

But whether the charter provision of the appellant city on the subject was repealed or not by the passage of ch. 540, Laws of 1909, is not material. In the instant case a right of action accrued in favor of the appellant before the passage of said ch. 540, therefore such cause of action was not affected by the repeal of the charter provision referred to.

The resolution of November 5, 1907, clearly and plainly required the railway companies crossing Belknap street to construct and maintain at their own expense a viaduct across their tracks and right of way on Belknap street, together with the necessary and proper approaches thereto so as to carry Belknap street and highway over their tracks and right of way in the manner required by law and the city charter. This resolution was served upon the railway companies in 1908 before the passage of ch. 540, Laws of 1909. Thereupon a cause of action accrued to the appellant to compel the construction of the viaduct as provided in the resolution. The city charter authorized the procedure taken for construction of the viaduct. Laws of 1891, ch. 124, subch. VI, sec. 35, sub. 51.

A cause of action having accrued in favor of the appellant by the passage and service of the resolution on the railway companies, it was not cut off by ch. 540, Laws of 1909, even though such chapter had the effect of repealing the charter provisions of appellant city authorizing it to compel construction of the viaduct at the expense of the railway companies. Sec. 4974, Stats.; *Miller v. C. & N. W. R. Co.* 133 Wis. 183, 113 N. W. 384; *Wells v. Remington,* 118 Wis. 573, 95 N. W. 1094; *Crocker v. Huntzicker,* 113 Wis. 181, 88 N. W. 232; *H. W. Wright L. Co. v. Hixon,* 105 Wis. 153, 80 N. W. 1110, 1135.

The learned circuit judge below seems to have rested his decision chiefly upon a contract relation between the appellant and the railway companies, namely, that both ordinances are valid and based upon a good consideration, and

that the appellant had power to make the contract notwith-
standing the charter provision which authorized the city to
require construction of the viaduct only at the expense of
the railway company. The learned trial judge says in his
opinion:

"So far as the *Northern Pacific Railway Company* is con-
cerned, that ordinance is binding on the city, as it was based
upon a valuable consideration passing to the city, that is, the
waiver of any claim for damages because of the construction
of the approach to the viaduct. While this approach was
constructed within the limits of Belknap street, yet the con-
struction prevented the *Northern Pacific Railway Company*
from extending its track across the street at that place, as it
had a right to do so long as it did not interfere with the use
of the street by the public. The railway company would
have the same right to recover for damages to its lands ad-
jacent to this approach in Belknap street that any other
property owner would have. The waiving of such a claim
for damages is a sufficient consideration to support a con-
tract."

The difficulty with this position is that the Great North-
ern Railway Company and the *Northern Pacific Railway
Company* were each obliged to build a viaduct at its own ex-
pense. Whatever damage was occasioned by the building of
a viaduct by each was chargeable to it. If the approach for
the Great Northern viaduct was a proper structure and
was in Belknap street, it was legally there in aid of travel,
and whatever damages were occasioned by it to other prop-
erty were chargeable to the railway company constructing
it. When it became necessary for the *Northern Pacific
Railway Company* to bridge its tracks and right of way and it
was required so to do by the city, the duty then rested upon
it to pay the cost of such construction, and no part of the ex-
pense could be shifted upon the city merely because the city
had passed an ordinance providing for an approach in Bel-
knap street where it crosses the right of way of the *Northern*

*Pacific Railway Company.* If the approach was not legally in the street, it was a nuisance and might be removed. If legally there, it was a burden which the railway company must bear without compensation or reward. The alleged ordinance could not legalize a nuisance, neither could the city make a valid ordinance assuming a burden which the charter did not authorize and which it was under no obligation to assume. Moreover, the ordinance, if valid, guarded the rights of the *Northern Pacific Railway Company* by providing that the approach should not interfere in any manner with the use of the tracks of the *Northern Pacific Railway Company* crossing Belknap street.' So the ordinance shows that the approach was to be in the street where it had a right to be and not interfere with the rights of the railway company. But if there were any damage occasioned by the construction of a viaduct by one railway company to the other, such damage could not be shifted and imposed upon the appellant under the guise of such an ordinance.

It is further contended on the part of the respondents, that, since this action was brought against the *Railroad Commission* to apportion the costs, it, must be conceded that the appellant city submitted to the provisions of ch. 540, therefore cannot complain that the *Railroad Commission* apportioned the costs in accordance with that law. This contention cannot be sustained. The appellant in its complaint and prayer assumed that the costs of construction be apportioned between the railway companies. The action was brought to compel the railway companies to construct the viaduct over their tracks on Belknap street, and in its petition the appellant prayed for an order directing the said railway companies, respondents, to construct and maintain at their own expense a viaduct over their several tracks where the same cross Belknap street, so as to connect with and constitute a continuance of the Great Northern Railway Company's viaduct existing on said street, and to determine the

proportion of costs of said improvement to be paid by each of said railway companies. It is manifest, therefore, from the proceedings taken before the *Railroad Commission* that the city proceeded on the theory that it was not to be charged with any portion of the cost of the improvements and that its submitting to the jurisdiction of the *Railroad Commission* simply authorized the *Commission* to apportion the costs between the railway companies as prayed, the case made being one which showed that the cause of action existed before the passage of ch. 540, under which cause of action the city could not be charged with any portion of the cost, but had the right to compel the railway companies to construct the viaduct at their own expense. It certainly cannot be said from the allegations of the petition and the prayer that the city intended to waive any rights which it had under its cause of action existing before the passage of said ch. 540.

We therefore conclude that the *Railroad Commission* had no authority to make the order charging twenty per cent. of the costs of the viaduct to the appellant city, and that the court below should have reversed that portion of said order of the *Railroad Commission* and remanded the proceeding to the *Commission* for further action therein.

*By the Court.*—The judgment of the court below is reversed, and the cause remanded for further proceedings according to law.

The following opinion was filed April 24, 1913:

BARNES, J. (*dissenting*). Surely the city under its charter has power to construct bridges and sidewalks, and to open, repair, and improve streets and make them safe. The viaduct in this case was nothing more than a bridge over a dangerous grade crossing. Should it be said that a city having the power to pave streets and construct sidewalks at the expense of the abutting property owners has no power to pay

any part of the expense from taxes collected from the taxpayers at large? I think not. In some of the smaller cities at least it is considered advisable to make expensive pavements where an assessment of the entire expense would be well nigh ruinous to the abutting owners. The fact that the abutting owners in this case are able to pay makes no difference with the principle involved. If it was fair and equitable that the city should pay a part of the expense of building this viaduct, and we must assume that the council thought it was, I think it had a perfect right to make the agreement which it did. In doing so it did not barter away its police power. Forbearance from exercising a power conferred to the full extent to which it might be exercised in a given case is very different from bartering it away. In my opinion the *Railroad Commission* and the circuit court reached a correct conclusion.

WINSLOW, C. J. I concur in the views expressed by Mr. Justice BARNES.

A motion for a rehearing was denied, with $25 costs, on October 7, 1913.