### APPLICATION OF KAISER.

*May 29, 1919—March 9, 1920.*

*Railroads: Highway crossings in cities: Subways: Streets on boundary line between town and city: Expense of separation of grades: Eminent domain: Elements of damages: Highway crossing railroad tracks: Compensation: Parties entitled.*

1. Sub. 48, sec. 3, ch. IV, of the Milwaukee city charter (Laws 1874, ch. 184), authorizing the common council to require railroad companies to construct viaducts at highway crossings, prohibits the city from assuming expense in connection with such work though the railroad is the senior way.

2. The damages to which a railroad company is entitled for the opening of a highway across its road do not include the cost of constructing a subway pursuant to said sub. 48 of the city charter.

3. The state may require the separation of grade crossings as a matter of police regulation, and place the burden on the railroad or the municipality, or apportion it as it sees fit.

4. A railroad company accepting a city ordinance and constructing a subway under its right of way cannot urge that at the time the ordinance was passed the street had been abandoned, under sec. 1294, Stats., in order to defeat liability for damages to property owners.

5. Sub. 48, sec. 3, ch. IV, of the Milwaukee city charter is construed to authorize the common council to require a railroad company to construct a subway at the time a street is first opened to travel.

6. Under said sub. 48, an ordinance requiring the construction of a subway was *ultra vires* so far as it placed the expense of the construction of the approaches on the city, and must be treated as an order to the railroad company to do the work at its own expense.

7. A railroad company required to separate grade crossings under said sub. 48 must compensate the owner of the property taken in consummating the separation.

8. Where the boundary between a city and a town was the middle of a street, the city had the same power to compel a railroad company to construct a subway under its right of way in the part of the street within the city limits that it would have to compel it to do so on any other street in the city, the town having agreed to the improvement.

APPEAL from an order of the circuit court for Milwaukee county: LAWRENCE W. HALSEY, Circuit Judge. *Affirmed.*

Condemnation proceedings by the owner of certain lots abutting on Oklahoma avenue in the city of Milwaukee for the recovery of damages occasioned by the cutting down of the street in front of said lots to bring it to the level of a subway under the tracks of the *Chicago & Northwestern Railway Company.* From an order appointing commissioners the railway company appealed.

The facts disclosed by the petition and the answer of the railway company are as follows: The center of Oklahoma avenue, a section line, forms the boundary between the city of Milwaukee and the town of Lake in Milwaukee county. It is sixty-six feet in width. The tracks of the defendant railway company cross said Oklahoma avenue. The railroad was constructed in 1854. In March, 1887, by virtue of a recorded plat, that portion of Oklahoma avenue lying north of the section line and east of the railroad right of way was dedicated as a highway. In 1886 the land south of the section line and east of the right of way was platted and the south thirty-three feet of Oklahoma avenue was thereby dedicated as a highway. The first highway crossing Oklahoma avenue west of the right of way is Clement avenue. Prior to 1895 no highway had been dedicated or laid out on said section line from the east line of the right of way to said Clement avenue. West of Clement avenue, however, a highway corresponding to Oklahoma avenue had been in use for many years.

In August, 1895, the city of Milwaukee and the town of Lake by joint action laid out a public street or highway sixty-six feet in width extending from the east line of the right of way west on said section line to the east line of Clement avenue. This highway so laid out, however, was never opened or used prior to October, 1911. It was provided by the order laying out this highway that the city of Milwaukee should make and keep in repair the north half thereof and the town of Lake the south half.

In July, 1905, the railway company made application to

the city of Milwaukee for permission to lay down and operate two additional tracks across certain streets in said city, including Oklahoma avenue. On October 16, 1905, the city council adopted an ordinance granting such permission upon condition that the railway company construct subway crossings at Kinnickinnic avenue and Pryor avenue, said avenues lying to the north of said Oklahoma avenue. It recited also the proceedings of 1895 laying out Oklahoma avenue, that proceedings for putting said avenue in condition for public travel in future were probable, and that said tracks would extend across said Oklahoma avenue, and required the railway company to construct and maintain a subway for said Oklahoma avenue, where the same is crossed by said tracks, within five years from March 1, 1906, provided that within that time the proper municipal authorities shall have put said Oklahoma avenue in condition for public travel and shall have completed the excavation for said subway up to the right of way on each side: "It being understood and agreed that said *Chicago & Northwestern Railway Company* shall bear the entire cost of said subway within its right of way, and shall be at no cost or expense for any work outside of its right of way or for damages resulting from any work done outside of its said right of way." It was further provided that the railway company should not at any time be required to construct said subway while a public highway existed across its right of way at Rusk avenue. This ordinance was duly accepted by the railway company. In 1908 the city of Milwaukee established the grade of Oklahoma avenue, taking the street under the tracks of the railway company, which grade was also established by the town of Lake. The city of Milwaukee cut and graded Oklahoma avenue during the year 1908, and the town of Lake in 1910, up to the right of way of the railway company, and during the year 1911 the railway company excavated across the right of way to the grade so established by the city and town, completing the

work in October, 1911. There was never any travel on Oklahoma avenue across said railroad tracks at grade. The petitioner owns lots located on the Milwaukee side of Oklahoma avenue and abutting thereon, from which material was taken in forming the approach to the bottom of the subway.

*R. N. Van Doren* of Milwaukee, for the appellant.

For the respondent there was a brief by *Otjen & Otjen* of Milwaukee, and oral argument by *Henry H. Otjen.*

The following opinion was filed November 4, 1919:

OWEN, J. The petitioner brings these proceedings on the theory that the soil removed from Oklahoma avenue, in making the approach to the grade of the subway under the railway tracks, was taken for railroad purposes. The railway company contends that the soil was taken for municipal purposes and that it is under no obligation to pay for the removal of the soil outside its right of way. The question to be determined, therefore, is whether the removal of the soil was for a railroad or municipal purpose. The charter of the city of Milwaukee (Laws 1874, ch. 184, subch. IV, sec. 3, sub. 48) confers upon the city council power "to require railroad companies to construct and maintain at their own expense, such bridges, viaducts, tunnels, or other conveniences, at public railroad crossings, as the common council may deem necessary." In *Superior v. Roemer,* 154 Wis. 345, 356, 141 N. W. 250, similar language in the Superior charter was held to prohibit the city from assuming expense in connection with such work. Commenting on the similar provision of the charter of the city of Superior it was said:

"This provision amounts to a prohibition. Where the charter provides for building at the expense of the railway companies and no other authority is conferred, the city cannot authorize building in the manner prescribed at the city's expense. It could not by indirection defeat the provisions of the charter."

This case must be ruled by that decision, unless it can be distinguished in substantial particulars so as to make the doctrine of the *Superior Case* fundamentally inapplicable here. It is true that in the *Superior Case* the street or highway was the senior way, while here the railway is the senior way, and we must consider whether this fact makes a different rule applicable. In the *Superior Case* the fact that the street was the senior way was given some prominence. But it is clear that the decision did not rest upon that fact alone. It was mentioned rather for the purpose of reinforcing the conclusion reached than furnishing a foundation therefor. In the opinion it is said:

"If a city should lay out a new public highway across the switch tracks and yard of a railroad, the city thereby creating the necessity of the viaduct or subway, *and there was no statute fixing the burden,* there might be some force in the claim that the city should bear the burden or some part of it."

It will be noticed that this concession couples two contingencies, one being that the railway is the senior way, the other being the absence of any statute imposing the burden of such construction upon the railroad company. A consideration of the entire opinion leaves no doubt that the decision was rested upon the provision of the city charter conferring upon it power to require railroad companies to construct subways or viaducts at public crossings, such provision at the same time depriving the city of any power to contribute to the expense of such undertakings. It was also pointed out that

"It is perhaps true that sec. 1836 [requiring a railroad company upon crossing a highway to restore such highway to its original state of usefulness] is not strictly applicable to viaducts and subways, but in connection with the provisions of the city charter quoted it is significant in determining upon whom the burden shall rest in cases like the present, where an old way is occupied by a new way."

These expressions taken from the opinion in that case make it plain that the fact that the street was the senior way was not controlling in reaching the conclusion there announced. Of course the situation there presented was such that the question of which was the senior way could be made use of to fortify the conclusion reached that there was no liability on the part of the city to contribute to the expense of the construction of the viaduct in question. The situation in this case is reversed. Concededly the railway is the senior way, and it is urged that instead of being required to restore the highway to its original state of usefulness it is entitled to damages because of the laying out of the highway over its right of way. That a railroad company is entitled to certain damages under such circumstances was decided by this court in *Chicago, M. & St. P. R. Co. v. Milwaukee,* 97 Wis. 418, 72 N. W. 1118. Damages to which it is entitled, however, do not include elements arising from compliance on its part with police regulations prescribed by state law. This is emphatically stated in the case referred to. That the separation of grade crossings is a matter of police regulation which the state may require in the interest of the safety of public travel and place the burden incident to the accomplishment thereof upon the railroad or the municipality, or apportion it as it may see fit, is settled by *Polk.v. Railroad Comm.* 154 Wis. 523, 143 N. W. 191, and *Milwaukee v. Railroad Comm.* 162 Wis. 127, 155 N. W. 948. It is pointed out in *Chicago, M. & St. P. R. Co. v. Milwaukee, supra,* that sec. 1836 creates two classes of highway crossings: one where the responsibility for their maintenance, as between the railway company and the municipality within which they are located, is on the former, and the other where such duty is on the latter. Because sec. 1836 requires a railroad to restore a highway to its original state of usefulness only when the railroad crosses the highway, it seemed to follow that

when the highway crosses the railroad the railroad is entitled to damages. In other words, the provisions of sec. 1836 are responsible for the rule laid down in the *Milwaukee Case, supra,* to the effect that a railroad is entitled to damages when an ordinary highway is laid across its right of way.

The legislation embodied in sec. 1836 must not be confused with legislation providing for the separation of grade crossings. Sec. 1836, in effect, has been upon our statute books from the very beginning of the state. That section requires no more than that the railroad company when crossing a highway shall restore the highway to its original state of usefulness, or, as held in the *Milwaukee Case, supra,* that the railroad company is entitled to damages when a highway is laid out across its right of way. Manifestly that legislation has reference to the ordinary grade crossing. The requirement that the railroad company shall restore the highway to its original state of usefulness does not contemplate a subway or viaduct, unless that be necessary owing to the topography of the *locus in quo* to restore it to its former state of usefulness. In the early days, when sec. 1836 was first enacted, the separation of crossings was little thought of, if at all. That idea has come with time and development, which have brought increasing population, activities, and traffic, multiplying the dangers incident to crossings of highways and railway tracks at grade. This has given rise to a new field of legislation. Legislation looking towards the separation of grade crossings deals with a distinct subject, and is prompted by special reasons. The requirement that the highway shall be restored to its original state of usefulness was to the end that travel might proceed in its accustomed way. Legislation looking towards the separation of grade crossings springs from the necessity of making such places which, by the increase of population and traffic, have become dangerous, safe for public travel. The circumstance which arouses

the power is the existence of a dangerous crossing. It matters not whether the crossing resulted from a railway crossing a highway or a highway crossing a railway. The mere fact that the crossing, no matter how or when created, constitutes a menace to the safety of persons and property engaged in public travel authorizes the state, in the exercise of its police power, to provide for the elimination of the danger. So that in considering where the burden is placed in the matter of accomplishing a separation of grade crossings we are not aided by a reference to sec. 1836 or decisions based thereon providing that highways shall be restored to their original state of usefulness, or that where the railroad is crossed by a highway it shall be entitled to damages.

The railway company insists, however, that the construction of the subway was not in the nature of a separation of crossings, and the situation in this respect should receive attention. At the time of the adoption of the ordinance in question Oklahoma avenue had not been opened up. It had been laid out by proceedings had for that purpose in 1895. It is contended by the railway company that by virtue of the provisions of sec. 1294 providing that "Every public highway already laid out or which shall hereafter be laid out shall cease to be considered a public highway at the expiration of four years from the time when it was so laid out, except such parts thereof as shall have been opened, traveled or worked within such time, . . . shall be considered legally discontinued," the proceedings laying out the highway had become nugatory long before the enactment of the ordinance of 1905. This, however, was not insisted upon by the railway company at the time of the passage of the ordinance or the digging of the subway, and all concerned, the railway company, the city, and the town, evidently treated the proceedings as subsisting, legal, and valid, and the railway company is not in any position at this time to urge that the highway laid out in 1895 was abandoned either in 1905 or 1911. Besides,

it is provided in sec. 1295, Stats., that "All highways which shall have been laid out by the supervisors of any town, . . . any portion of which shall have been opened and worked for the term of three years shall be deemed to be and are hereby declared to be legal highways so far as they have been so opened and worked, notwithstanding the law may not have been in all respects complied with in laying out the same." That Oklahoma avenue is a public street cannot well be questioned at this time. The terms of the ordinance reciting the proceedings laying out Oklahoma avenue, the acceptance by the railway company of its terms, the digging of the subway on its right of way,—all indicates that the railway company acquiesced in the validity of the proceedings laying out the street or highway and cannot be permitted at this time to challenge their legality.

It is further argued that because there was no crossing at the time the ordinance was enacted, nor at any time prior to the digging of the subway, the digging of the subway was merely a part of the opening of the street and was not in response to a direction of the city council requiring a separation of grades. It is true that the provision of the city charter under consideration authorizes the common council to require railroad companies, at their own expense, to furnish such tunnels, viaducts, and other conveniences at public railroad crossings as the council may deem necessary. Taken literally, it would seem to require the existence of a public crossing before the power of the common council in this respect could be exercised. Such a construction would simply require the useless proceeding of first opening up a street over a railroad track. The day after it was opened the power of the common council would be unquestioned. Such a construction would approach absurdity. We construe the provision of the charter as authorizing the common council to exercise the power conferred whenever the opening up of a street is in contemplation, thus preventing unnecessary circuity and surplusage of effort resulting

from first opening up the street and making in truth and in fact a grade crossing.

We proceed with our consideration, therefore, upon the supposition that the construction of the subway under the railroad tracks on Oklahoma avenue was a separation of grades and not a mere opening up of the highway. In order to ascertain where the burden is placed, we must refer to the law relating to the separation of grade crossings, and we are not at all concerned with the correlative rights and duties resting upon the municipality and the railway company in cases of grade crossings. This brings us to a consideration of the force that should be ascribed to the ordinance passed in 1905. There is no question but that the work done by the railway company, the city, and town in the construction of the subway is referable to this ordinance. It is the contention of the railway company here that, because the ordinance laid upon the municipality the duty of bringing the street to grade from its natural surface to the bottom of the subway, the railway company was by the same token relieved of any liability in the premises. This must be conceded if the ordinance is to be accorded the force and status of a contract. But, as already seen, the city was wholly without power to assume any responsibility in the premises. It could direct and require the railway company to construct the subway; but such construction must be at the expense of the railway company under and pursuant to the charter provision heretofore quoted. The city itself could not agree to bear any part of the expense of the undertaking. Treated as a contract, therefore, we find that that portion thereof pretending to obligate the city for the grading of the street from the surface to the bottom of the subway was *ultra vires* and void. It being conceded that the subway was constructed pursuant to the terms of the ordinance, which was void as a contract, it can only be construed as a direction or an order of the common council to the railroad company to construct the subway pursuant

to the power conferred upon it by the charter provision above referred to.

The foregoing considerations bring this case squarely within the doctrine not only of *Superior v. Roemer,* 154 Wis. 345, 141 N. W. 250, but that of *Pabst B. Co. v. Milwaukee,* 157 Wis. 158, 147 N. W. 46, and *Eisler v. C., M. & St. P. R. Co.* 163 Wis. 86, 157 N. W. 534, in which latter cases it was held that, where the duty to separate grade crossings rests upon the railroad company, property taken in consummating the separation is taken for railroad purposes and must be compensated for by the railroad company. It follows that the taking here was a taking for a railroad purpose and, no compensation having been made for the property taken, the petitioner is entitled to maintain these proceedings.

*By the Court.*—Order affirmed.

The appellant, *Chicago & Northwestern Railway Company,* moved for a rehearing.

In support of the motion there was a brief by *R. N. Van Doren* of Milwaukee, attorney for the appellant.

In opposition thereto there was a brief by *Otjen & Otjen* and *John L. Newman,* all of Milwaukee, attorneys for the respondent *William F. Kaiser.*

The following opinion was field March 9, 1920:

Owen, J. On a motion for rehearing appellant's attorney urges upon our attention an aspect of the case not heretofore presented or considered. He earnestly contends that because the authority of the city of Milwaukee ceases at the center of the street, and it neither had power to order the subway constructed on the town of Lake side of the street, or to destroy the street in a physical sense by constructing a subway on its side of the street and leaving the grade crossing on the town side, its charter powers, referred

to in the main opinion, could not be invoked to bring about the construction of the subway in question.

It may be conceded that the city had no jurisdiction of the town side of the street and that it could not physically destroy the street by digging a subway in its half thereof. But certain it is that the two municipalities, by agreement, could improve this street by the construction of the subway; that they did so agree, whether the agreement was express, implied, or by mutual acquiescence, is perfectly clear from the record in this case. The municipalities having agreed upon the nature of the improvement, the duty devolved upon each to prosecute such improvement upon its side of the street, and in doing so its power with reference to such improvement was exactly the same as in cases of improvements upon any other street within its boundaries. The city of Milwaukee had the same power to compel the railroad company to construct the subway in its part of the street that it would have to compel it to do so upon any other street in the city. The case does not present a situation where the city is seeking to destroy the street, or of forcing an improvement opposed by the town of Lake. If such were the case, the controversy would be between the city and the town. It would be doubtful if the railroad company could be heard to complain. In this case the city decided that its portion of Oklahoma avenue should be depressed so as to cross the right of way of the railroad company under its tracks. Upon such determination it became the duty of the railroad company to bear the burden of the undertaking just as though it were in a street over which the city had complete jurisdiction. That it was not the duty of the railroad company to construct the subway on the town side of the street does not relieve it of that duty on the city side.

*By the Court.*—Motion for rehearing denied.