CITY OF MILWAUKEE, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*January 10—March 4, 1919.*

*Municipal corporations: Railroads: Viaducts: Construction and maintenance: When viaduct is a new way: Part payment of cost by railroad company: Vacation of part of street: Contracts: Constitutional law: Police power.*

1. The viaduct across the Menominee valley constructed by the city of Milwaukee pursuant to ch. 122, Laws 1891, was understood and intended by the legislature, by the city, and by the defendant railway company, whose tracks crossed Muskego avenue in said valley, to be and it constitutes a new way or street; the vacation by the city, in accordance with sec. 8 of said act, of so much of Muskego avenue as was occupied by the yard tracks and right of way of the defendant—thus relieving defendant of a part of its burden of maintaining crossings over said avenue—was in consideration of the payment by defendant of an agreed sum as part of the cost of the viaduct; and the new street was not in any sense an alteration or a substituted way for said avenue. The railway company was not bound, therefore, under the statutes, the common law, or the city charter, to construct said viaduct, and is not bound to maintain or repair it.

2. Ch. 122, Laws 1891, authorizing the city to construct said via-
   duct and to contract with the defendant railway company for
   payment by the latter of a part of the cost and for vacation
   of a part of Muskego avenue, did not violate sec. 31, art. IV,
   Const., as it then stood, and was a valid exercise of the police
   power to supervise and control thoroughfares in the interest
   of public safety and convenience.
3. The contract so authorized between the city and the railway
   company remains subject to legislative control, and the right
   to exercise the police power of the state on the subject is not
   bargained away.

    WINSLOW, C. J., and KERWIN and ROSENBERRY, JJ., dissent.

APPEAL from a judgment of the circuit court for Mil-
waukee county: E. T. FAIRCHILD, Circuit Judge. *Affirmed.*

The case was tried before Judge ORREN T. WILLIAMS,
then referred to him as referee after his term had expired.
The referee's report having been filed, an order approving
it was made and judgment entered dismissing the complaint.

This action was brought by the city of *Milwaukee* to re-
cover from the *Chicago, Milwaukee & St. Paul Railway
Company* the amount of money spent by the city in repair-
ing a viaduct across the Menominee valley in the city after
the company had refused to do so. The facts material to
the controversy are, in substance, as follows:

Muskego avenue was a public street in the plaintiff city
before the 17th day of October, 1891, and was a public high-
way running approximately from what is now the south-
west corner of the city, northeasterly to a point where Green-
field avenue and Eleventh avenue cross in the city, then
northerly to a point where South Pierce street and Eleventh
avenue cross in the city, and then northeasterly across the
Menominee valley, intersecting a point where Thirteenth
street meets North Canal street in the city. This highway
existed before the defendant or its predecessors procured
any right of way or laid any tracks in that part of the Me-
nominee valley.

Milwaukee v. Chicago, M. & St. P. R. Co. 168 Wis. 534.

AFTER

Before the 17th day of October, 1891, the defendant pro-
cured the right of way and laid tracks in the Menominee
valley crossing Muskego avenue at grade at various places
between Park street and the north line of North Canal street.
These crossings were dangerous because of their number
and because of their close proximity to each other, and be-
cause the defendant engaged in almost constant switching
and other train operations over the crossings; all of which
impaired the usefulness of the street and made it necessary
that a viaduct or some other means of separating the rail-
road from the street be erected.

The legislature of the state of Wisconsin enacted a law,
published April 7, 1891, known as ch. 122, Laws 1891, pro-
viding for issuing bonds, constructing a viaduct across Me-
nominee valley, and for condemnation of lands therefor.

Under the provisions of the act the plaintiff secured the
strip of land mentioned therein at a total cost of $100,454.06
upon which to build a viaduct across the valley. The via-
duct was completed in 1895 at a total cost of $298,991.07,
of which amount the defendant on October 17, 1891, agreed
to pay and later did pay the sum of $125,000, pursuant to a
contract made between it and the city under the provisions
of the act above mentioned. On July 25, 1895, the plaintiff
duly vacated so much of Muskego avenue as was occupied
by the yard tracks and right of way of the defendant in
accordance with sec. 8 of this act, thus discontinuing Mus-
kego avenue as a street at this point.

In the next fourteen or fifteen years the viaduct became
so corroded, weakened, and out of repair that the common
council on November 12, 1909, passed a resolution directing
the railway company to repair the viaduct, or, in event of its
refusal, authorizing the board of public works of the city to
proceed with the repair and to determine the proportion of
the cost thereof which should be borne by the defendant.
The railway company refused to contribute to the repair or
reconstruction of the viaduct; the city made the repairs at a

cost of $98,995.65, which amount the city in this action seeks to recover against the defendant.

For a defense the answer of the railway company alleges that it is not liable for the cost of repairs of the viaduct and that the circumstances existing at the time of the building of the viaduct in 1891 have not materially changed since that date; that under a contract entered into by the city and the railway company under ch. 122, Laws 1891, the defendant is not obligated to contribute towards the expense of the repair of the viaduct; and that the work done by the plaintiff upon the viaduct after November, 1909, was greater and much more expensive than was necessary.

Among other things the referee found:

That Muskego avenue as it existed in 1891 when ch. 122, Laws 1891, was passed, started at the north side of South Pierce street on the hill on the south side of Menominee valley, opposite the north end of Eleventh avenue on the south side of said South Pierce street, and ran northeast across the said valley to the north line of defendant's right of way of its Prairie du Chien division at the foot of the hill on the north side of the valley, and connected with Fowler street, the west side of said avenue coming to the south side of North Canal street about on the west line of said Thirteenth street extended south to said Canal street; that said Muskego avenue, within the termini described, crossed by means of bridges the north Menominee canal and the south Menominee canal, and was crossed on the south side of said valley by defendant's Muskego yards tracks, which covered a space of about 329 feet in width north and south by one track lying 497 feet north of said yard and leading to the plant of the Plankinton Packing Company, by two tracks in South Canal street 773 feet north of the track leading to the plant of the Plankinton Packing Company, by two main-line tracks, part of the Prairie du Chien division of defendant's railroad, 1,150 feet north of South Canal street, and by sidetracks branching from the south main track of its said Prairie du Chien division; that some time after 1891 the bridge carrying Muskego avenue across the Menominee canal was made a bascule bridge by the city; that the north end of Muskego avenue after 1891 was changed, . . .

and connected with Thirteenth street, and has been so con-
nected ever since the erection of said Sixteenth street viaduct,
and ever since the erection of said Sixteenth street viaduct
said Thirteenth street and said Muskego avenue have been
extensively used by the public as far south as defendant's
Muskego yard, and that the *south end* of said Muskego ave-
nue has ever since the construction of said viaduct been ex-
tensively used by the public as far north as defendant's Mus-
kego yard; that all that part of Muskego avenue lying north
of the defendant's Muskego yard has, ever since the open-
ing of said viaduct for travel, been connected with the via-
duct by an inclined bridge or roadway leading from the
viaduct down to Muskego avenue, which inclined bridge or
roadway for general traffic is located 860 feet north of de-
fendant's Muskego yard and in the middle of the entire
length of Muskego avenue extending between South Pierce
street on the south and Clybourn street on the north of Mus-
kego valley, and all that part of Muskego avenue from the
north side of defendant's Muskego yard to the north end of
Muskego avenue has been extensively used by the public con-
tinuously since the viaduct was opened for travel; that Mus-
kego avenue for over 3,800 feet, less the 329 feet occupied
by defendant's Muskego yard, has ever since the erection of
said viaduct been maintained by the plaintiff and used by the
public for team and foot traffic the same and to a much
larger extent than it ever was before the viaduct was built;
that the business places along Muskego avenue are much
larger than they were when the viaduct was built, and others
are maintained that were not there in 1891, and all are
reached by using Muskego avenue and the inclined way con-
necting the viaduct with Muskego avenue; that the team and
foot traffic or travel across defendant's Prairie du Chien
division main tracks on the north side of the valley has in-
creased more than fifty per cent. since the building of the
viaduct; that South Canal street, which crossed Muskego
avenue in 1891, has ever since said date been maintained by
the city; that the defendant in 1891 operated in said South
Canal street two railroad tracks at the grade of Muskego
avenue and has so operated them ever since said date, and
that ever since said date Muskego avenue for a distance of
over 3,800 feet, or some nine tenths of its entire length, has
run along the ground with railroad tracks crossing it at
grade north of defendant's Muskego yard, as before the via-

duct was built; that the grade of Muskego avenue on the hill on the south side of the Menominee valley at the time of the passage of said ch. 122, Laws 1891, was so steep that travel thereon to reach the valley was inconvenient and travel thereon by team with heavy loads was impracticable; that the highway on the hill on the north side of the valley, used to reach the valley, in 1891 was also so steep that travel thereon to reach the valley was inconvenient and travel thereon by teams with heavy loads was impracticable, and there was public necessity for a highway across the valley more suitable and convenient than Muskego avenue as it existed in 1891; that the hills on each side of the valley used in passing to and from the valley were fifty feet higher than the surface of the valley, and that a viaduct across the valley practically on a level with the surface of the hills would, in 1891, constitute a suitable and convenient highway across the valley.

That the Sixteenth street viaduct was built under and pursuant to ch. 122, Laws 1891; that it was the construction of a new way nearly on a level with the top of the banks of the Menominee valley; that it was not contemplated that after the construction of the viaduct Muskego avenue north or south of defendant's Muskego yard would be vacated by the viaduct nor that it would be abandoned; that the viaduct was not intended to and did not alter the course of Muskego avenue without changing its termini and did not straighten out and continue Muskego avenue across the valley on the viaduct, and the said avenue was not in any manner or by any means vacated or changed, except as stated heretofore.

The referee's conclusions of law are:

(1) That the Sixteenth street viaduct across the Menominee valley was intended to be used as a new way or street and was not an alteration of Muskego avenue without changing its termini, and did not vacate that avenue nor contemplate vacating it except through the Muskego yard.

(2) That the plaintiff has no power or authority, by charter or other statute, to compel the defendant to pay any part of the cost of the repairs made by plaintiff to said viaduct, it being a new way.

(3) That ch. 122, Laws 1891, is valid, has not been repealed and is still in force, and the plaintiff is bound by the contract made under it.

(4) That the plaintiff cannot recover in this action, and that the complaint should be dismissed with costs.

Upon the approval by the court of the report of the referee, judgment was entered dismissing the complaint and awarding costs to the defendant. Appeal is taken from this judgment.

*Clifton Williams,* city attorney, for the appellant.

*C. H. Van Alstine* and *H. J. Killilea,* both of Milwaukee, for the respondent.

SIEBECKER, J. The claim is made that the railway company is liable for the cost of maintenance and repair of the viaduct. This presents the question whether the viaduct constitutes an alteration or a changed way of Muskego avenue, which the defendant's railroads cross, or whether it is a new way. The referee and the trial court held that the viaduct is a new way and that the railway company is not obligated to repair and maintain it as a railroad crossing. The city assails this conclusion upon the grounds that the facts and circumstances disclosed by the evidence clearly show that the viaduct constitutes in fact and law a substituted crossing for defendant's railroad crossings over Muskego avenue and hence is not a new way. The physical situation is shown in detail by the facts found by the referee and is set forth in the foregoing statement. It appears that Muskego avenue is an old established highway crossing the Menominee valley and forms the connecting thoroughfare between the city lying on the north of the valley and the portion lying on the south. It crossed the valley in a northeasterly and southwesterly direction, and within its termini was crossed by the north and south Menominee canal bridges, by defendant's yard tracks, industrial and main-line tracks, shown in the detailed statement made above. Prior to 1891 the city and the railway company's representatives had frequent negotiations concerning the public need to make travel across the valley safer and more convenient, but

failed to consummate and provide a scheme to accomplish this end. Two legislative acts had been passed before the act of 1891 under which this viaduct was built: ch. 476, Laws 1887, entitled "An act to provide for the laying of a highway and the building of a viaduct across the Menominee river," and ch. 231, Laws 1889, entitled "An act to amend the charter of the city of *Milwaukee.*" The first act authorized the construction of a viaduct and provided that the city should build the north and the defendant the south half thereof, if the defendant in writing, within sixty days after its passage, declared its acceptance or rejection of the provisions of the act and complied with its terms. The act also provided for future maintenance of the viaduct by the city and the railway company in the same proportion as was fixed for the original construction. The act makes no reference to provide for altering, changing, or vacating Muskego avenue. Nothing is shown to have been done under this act before ch. 231, Laws 1889, was enacted. This act authorizes the city to acquire by condemnation a strip of land seventy feet wide across the Menominee valley connecting the north and south parts of the city. This strip is located the same as the strip which was acquired under the provisions of ch. 122, Laws 1891, and on which the existing viaduct has been located. The act of 1889 provided that the city use such strip of land for public purposes and specifies, among other things, that the city "may construct, erect and maintain thereon any public bridge or bridges, *viaduct,* abutments, piers or other thing, and improve the same or any portion thereof as a public street or walk, . . ." While nothing was done in constructing the viaduct as provided by these legislative acts, it is manifest that the object was to construct a viaduct across the Menominee valley at the place where the existing viaduct is located. Neither act treated the viaduct as a substitution for or a vacation of Muskego avenue. The viaduct was treated as a separate and independent street to meet the requirements of the public under the changed con-

dition of travel across the valley. That such legislation was appropriate to enable the city to meet the public needs is recognized in the case of *Bingham v. Milwaukee Co.* 127 Wis. 344, 106 N. W. 1071, wherein ch. 444, Laws 1903, authorizing the construction of "viaducts by counties having a population of 150,000 or more," was considered. The board of supervisors of Milwaukee county acted under this statute to construct a viaduct across the Menominee valley, connecting Grand avenue on the east and west sides of the valley. The basis for such legislation is there well stated in these words:

"That large and populous cities need better, safer, and more expensive highways and bridges for the accommodation of their teeming populations than small communities no one will deny. The simple rural highway and the inexpensive bridge may be ample for all purposes in the village or small city, while for the congested conditions of the great city the asphalt pavement and the broad and expensive bascule bridge may be not only proper, but absolutely essential to human safety."

It is manifest that the city of *Milwaukee* acted under ch. 122, Laws 1891, in building the viaduct in question. The provisions of sec. 31, art. IV, Const., as they stood at the time this chapter was enacted did not prohibit legislation granting special corporate power or privileges to cities or to amend their charters, and hence no objection exists against the provisions of this act as violative of the constitutional provisions. An inspection of the location and nature of the structure and the uses and purposes for which it was built shows that the structure is not a part of nor an alteration of Muskego avenue. Its southern terminus is at the point of intersection of Muskego avenue and South Pierce streets on the hill on the south side of the valley; its course thence is wholly outside of Muskego avenue, and crosses the valley on a line not occupied as a street to a northern terminus, namely, the south end of Sixteenth street, a distance of 4,100 feet, and its northern terminus is 1,300 feet away from the

northern terminus of Muskego avenue. The viaduct crosses the defendant's Muskego yard tracks 250 feet west of the place where Muskego avenue crossed such tracks. It opened up and furnished a wholly different public street in connection with streets at its termini than does Muskego avenue, and provides a new, improved, safe, and convenient highway to meet the requirements of the new and additional public needs, for which use Muskego avenue was not adapted. It also appears that all of Muskego avenue except the small part which crossed defendant's yard tracks in the south part of the valley was needed and was retained for public use and is now so used, as is specifically shown by the facts stated in the referee's report. The provisions of ch. 122, Laws 1891, authorizing the city to enter into negotiations and to contract with the defendant for part payment of the cost of constructing this viaduct "as shall be agreed upon in consideration of any agreement which shall be made by said railway company in regard thereto, to vacate such portions of Muskego avenue as are occupied by the tracks and right of way of said railway company as shall be desired by said railway company and agreed upon by said city and railway company," thereby relieving the railway company from building viaducts, causeways, or passageways over any part of Muskego avenue so vacated, do not in effect constitute an alteration of this avenue or change or substitute its course to the viaduct provided for by the act. The state proposed to the railway company to vacate a part of the avenue upon the condition that the railway company contribute a sum of money to the construction of the new way. The legislation is manifestly based on the idea that the railway company was not obligated under sec. 1836, Stats., and sub. 48, sec. 3, ch. IV, of the city charter to construct or maintain any part of the new viaduct spanning its right of way and yards in the valley, and that, by consent of the state, the railway company might, for a consideration, be relieved from a part of the burdens of maintaining crossings over Muskego avenue.

Since the state in the exercise of its police power could regulate these duties as to Muskego avenue, it could properly empower the city to make these proposed arrangements authorized by ch. 122, Laws 1891, to provide new ways for improving public safety and convenience and abandon such Muskego-avenue crossing over defendant's railroad yards. It is within the legislative supervising power and control of public thoroughfares to attain this public purpose in the manner provided. Any contract between the city and railway company for this purpose is subject to legislative control and hence does not bargain away the right to exercise the police power of the state on the subject. As stated in *Chicago, B. & Q. R. Co. v. Nebraska,* 170 U. S. 57, 18 Sup. Ct. 513, "Contracts of the latter description are held to be within the supervising power and control of the legislature when exercised to protect the public safety, health, and morals, and that clause of the federal constitution which protects contracts from legislative action cannot in every case be successfully invoked. The presumption is that when such contracts are entered into it is with the knowledge that parties cannot, by making agreements on subjects involving the rights of the public, withdraw such subjects from the police power of the legislature." *Chicago & A. R. Co. v. Tranbarger,* 238 U. S. 67, 35 Sup. Ct. 678.

The right of this legislative control of this subject is pertinent in ascertaining the legislative intent embodied in ch. 122, Laws 1891. An examination of the provisions of the act, in the light of the condition of the public uses of Muskego avenue and the public necessity of improving the facilities for travel over Menominee valley, clearly indicates that the legislature was impressed that public convenience and necessity required additional facilities for travel across Menominee valley and intended that the city should provide for this need by building the additional street over the new viaduct, and under the state's supervising power the city was authorized to use for this purpose whatever sum of money

it and the railway company agreed the company should pay for being relieved of a part of its burdens of·maintaining crossings upon Muskego avenue, by means of vacating a part of the avenue. We are persuaded that the legislature, the city, and the railway company understood and intended that the viaduct was to be a new street and that the vacation of a part of the avenue was to be in consideration of the railway's agreement to pay the sum agreed upon as part payment of the cost of building the viaduct, and that the new street was in no sense an alteration or substitution of the avenue. The greater part of the avenue still exists and provides a highway for many of the uses to which it was devoted before vacating the part over the yard tracks. The suggestion that the provision of ch. 122, Laws 1891, authorizing an exemption to the railway company from maintaining its yard-track crossing, operates as a substitution and transfer of it to the viaduct is not'well founded. As above shown, the provisions of the act fail to disclose any such intent. The viaduct being a new way, the railway company was not in law liable to construct and maintain it as a crossing. It is also plain that the duty of the railway company to construct and maintain highway and street crossings is imposed on them under the police power of the state to secure the public against injury on account of the twofold use of the crossing, and any exercise of the legislative right to provide regulations concerning them is confined to the places which call for the exercise of this power. It is a power which attaches to and is inseparable from the place of crossing. When the public thoroughfare is abolished the duty expires, and is not transferable to a new place unless the new place constitutes in law a substitution of the former crossing. This was evidently the legislative understanding, and hence it authorizes the city to contract with the defendant for vacating Muskego avenue at a crossing upon a consideration to be paid by the railway company for being relieved of this duty. It would be illogical to hold that such

crossing duty of the railway on Muskego avenue could be transferred to another street and affixed to a place where no such duty exists.

It is considered that Muskego avenue was not altered by the construction of the viaduct upon the lines specified in ch. 122, Laws 1891; that the viaduct constitutes a new way or street across the Menominee valley; and that the railway company was not obligated under the statutes, the common law, or the city charter to construct, maintain, or repair the viaduct spanning its right of way. These conclusions are decisive of the case and elaboration of other points argued is not required.

*By the Court.*—The judgment appealed from is affirmed.

WINSLOW, C. J. *(dissenting).* The amount involved in the present case is considerable, but the principle involved is of far greater importance. I am so strongly convinced that the public burdens are wrongly distributed by the judgment that I feel it a duty to state the grounds on which that conviction is based.

The fundamental propositions are these: (1) The law contemplates that a railway company crossing a highway shall not impair its usefulness and shall, in case the crossing is thereby made dangerous to life or an obstruction to travel, construct and forever maintain such substituted way or ways as may be best calculated to restore the safety and convenience of the original way. (2) The viaduct in question here is in part (the extent of which part is easily ascertainable) a substituted way for the Muskego avenue crossing which was made dangerous by the defendant's tracks, and hence the defendant should rightfully pay its proportionate share of the cost of repairs of the viaduct.

There will probably be little disagreement as to the first proposition and I shall spend little time on it. Since 1872 the statutes of this state have provided that a railroad company constructing a railroad across a street shall restore the

same to its former state or to such condition that its usefulness shall not be materially impaired and thereafter maintain the same in such condition against any effects produced by such railroad. Sec. 1836, Stats.

This requirement is, however, but a statutory recognition of a common-law principle which existed long before the passage of our statute. *State ex rel. Minneapolis v. St. P., M. & M. R. Co.* 35 Minn. 131, 28 N. W. 3; *State ex rel. Minneapolis v. St. P., M. & M. R. Co.* 98 Minn. 380, 108 N. W. 261 and cases cited in opinion. This court has approved the doctrine to the fullest extent. *Superior v. Roemer*, 154 Wis. 345 (141 N. W. 250) on p. 356.

The charter of the city of *Milwaukee* (ch. 184, Laws 1874, sub. 48, sec. 3, subch. IV) recognized the principle by giving the city council power "to require railroad companies to construct and maintain at their own expense, such bridges, viaducts, tunnels, or other conveniences, at public railroad crossings, as the common council may deem necessary." Doubtless similar power is conferred by most of the city charters of the state. It is to be found in the general city charter—sub. (51), sec. 925—52, Stats.—and in the special charter of the city of Superior.

The authorities which hold that a city cannot contract with a railroad company to keep such a structure in repair and thus relieve the railroad company from its duty because there is no consideration for such a contract, are numerous and decisive. Furthermore, the question has been directly decided by this court. *Superior v. Roemer, supra,* and authorities there cited, to which may be added *Newton v. C., R. I. & P. R. Co.* 66 Iowa, 422, 23 N. W. 905; *Wabash R. Co. v. Defiance,* 167 U. S. 88, 17 Sup. Ct. 748.

Proceeding to take up the second proposition, I freely admit that the viaduct satisfies and was intended to satisfy certain public needs not resulting from the construction of the railroad or the presence of the tracks. Here was a deep valley, four fifths of a mile wide, containing two canals run-

ning through the city, and it goes without saying that a viaduct making possible travel at grade between the two parts of the city thus separated is a municipal improvement demanded by considerations of convenience and public welfare whether there is any railroad in the valley or not. But the fact that the viaduct was demanded by and efficiently answers to such needs does not prevent it from answering other needs, *i. e.* the need of a safe crossing in place of the old Muskego avenue crossing. If it does this it is in substance the Muskego avenue crossing changed to a slightly different location, and just so far as it serves the purpose of that crossing the railway company should be required to maintain it. That the city, the railway company, and the legislature all regarded this new way and viaduct as a substitute for the Muskego avenue crossing and deemed that the proportionate share of the whole expense of the viaduct which this substitute justly represented was capable of definite ascertainment, cannot in my judgment be doubted.

The very first act passed by the legislature on the subject (doubtless at the request of the city authorities) conclusively shows that the legislative thought then was that the proposed viaduct was made necessary in part because the defendant's tracks had made it dangerous to use Muskego avenue. This act (ch. 476, Laws 1887) requires the railway company to build the south half of the viaduct simultaneously with the building of the north half by the city, and provides for perpetual maintenance of the same by the railway company and the city in the same proportions. The railway company did not comply with this act and apparently no attempt was made to compel obedience. It is unnecessary to discuss the question here whether obedience could have been compelled or not: the chief significance of the act is that it expressed the judgment of the legislature at that time that the improvement was a joint improvement, to the expense of which the railway company should be required to contribute a just proportion. This could only be on the

theory that the company had so greatly impaired the usefulness of the Muskego avenue crossing that it became its duty to provide another.

This act having failed of its purpose, ch. 231, Laws 1889, was passed, providing that the city should at once condemn the lands over which the viaduct now passes and should have power to use the lands condemned for a bridge or viaduct and any other proper street. In this act no reference is made to the railway company. Whether it had been concluded by the city that the company could not be compelled to contribute to a viaduct not located on the line of Muskego avenue, or whether it was thought that it would be best to make the Sixteenth street viaduct purely a city enterprise and require the railway company to build a separate viaduct on the line of Muskego avenue, is not clear and probably not important.

At any rate it is certain that in January, 1891, the common council of the city had determined that, if the railway company was not willing to contribute its just share of the expense of the contemplated viaduct at Sixteenth street, it should be compelled to build a separate viaduct at Muskego avenue carrying that avenue over all the company's tracks which crossed the same. This appears from two resolutions passed by the council, the first January 12, 1891, providing for the appointment of a special committee to confer with the officers of the railway company relative to the construction of a viaduct over their tracks in the Menominee valley and as to what proportion of the expense the company would bear, and the second, passed February 9, 1891, directing the railway company to build separate viaducts, with easy approaches and on plans approved by the city engineer, over all its tracks where the same cross Muskego avenue and Thirteenth street.

This was the situation of affairs when ch. 122, Laws 1891, was passed March 30th of that year; the railway company had declined to contribute to the expense of constructing the

joint crossing at Sixteenth street and had been ordered by the common council to build separate viaducts carrying Muskego avenue over all its tracks. Doubtless the defendant's officers realized that this order was perfectly valid and capable of enforcement. Naturally enough, results began to follow very quickly; the time for delay had passed, and ch. 122, Laws 1891, was placed upon the statute book.

Remembering that the railway company was at that time under order to construct its own viaduct, it becomes entirely plain that the act was the result of negotiation between the city and the company, and it becomes perfectly clear, also, that all parties interested understood that the viaduct authorized by that act was to be in part a substitute for the Muskego avenue crossing and as to such part to be paid for by the railway company. The act shows on its face that in case agreement could be reached between the city and the company as to the just amount which the company should contribute to the expense of the viaduct, so much of Muskego avenue crossed by the tracks as was desired by the company was to be vacated and the crossing abolished, and, as a necessary result, the portion contributed by the railway company to the Sixteenth street viaduct accepted by the public in place of the old Muskego avenue crossing. I shall not attempt to dissect the act in order to demonstrate this. The very careful provisions requiring the vacation of those parts of Muskego avenue as soon as the company had paid its proportion of the expense of the viaduct, and the further provisions formally relieving the company of the duty to build any viaduct over any part of Muskego avenue for all time to come, however great the multiplication of tracks, leave no room for doubt on the point. So far as this crossing is concerned, Muskego avenue was to be transferred to the Sixteenth street viaduct when the arrangements authorized by this act were carried out.

Nor is it difficult to determine how large a portion of the new viaduct is in effect the Muskego avenue substitute cross-

ing. The city and the company agreed on $125,000 as the just amount which the railway company should pay for its share of the viaduct, and the engineer of the defendant, testifying on the present trial, stated that the cost of the Muskego avenue viaduct ordered to be built in 1891 (exclusive of the drawbridge over the canal) would have been $116,386. Apparently the sum agreed upon quite fairly represented the railway company's share. The proportion which this amount bore to the total cost of the viaduct would in my judgment correctly represent the proportion of the expense of repairs which the railway company should be required to pay. No agreement relieving the company of its obligation to pay this proportion could be made, because not only did the act of 1891 fail to authorize it, but no such agreement would bind the city in any event under the principles already stated.

Our statutes not only allow but provide for making reasonable change in the location of highways and crossings which have been made dangerous or undesirable by the presence of railroad tracks. Sub. (5), sec. 1828, and sec. 1836, Stats.

To my mind that is substantially what was done in the present case by the joint affirmative action of the state, the city, and the company. If so, the viaduct has become in substance the old crossing in a changed location. True, it is more than that: it is also a great municipal improvement demanded by other public needs, but that does not prevent it from being to a definite and ascertainable extent the Muskego avenue crossing in a different location. To hold otherwise seems to me to subordinate the substance of things to mere names.

In my opinion the judgment in this case relieves the company by judicial action of a duty laid upon it not only by the common law but by statute.

Kerwin and Rosenberry, JJ., concur in the foregoing dissenting opinion.