STATE ex rel PAYNE, Attorney General, et al Plaintiffs, v. DAKOTA CENTRAL TELEPHONE COMPANY et al, Defendants.

(171 N. W. 277).

(File No. 4526    Opinion filed March 24, 1919).

1.   Telegraphs and Telephones—Injunctions—Railroad Commissioners, Enjoining Threatened Intrastate Telephone Rates Schedules—Federal Control and Operation, Under Congressional Resolution, Postmaster General's Order and Presidential Proclamation During War, As Defense—Proviso in Resolution Saving "Lawful Police Regulations," to States, Construed.

The joint resolution of Congress of July .16, 1918, provides that the President during continuance of present war is authorized and empowered, whenever he shall deem it necessary for national security or defense, to supervise or take possession and assume control of any telegraph, telephone, etc., system or systems, and to operate same in such manner as may be needful or desirable for duration of the war. A proviso there-

to provides that nothing in the act ·shall be construed to amend, repeal, impair, or affect existing laws or powers of the states relating to taxation or "the lawful police regulations" of the several states, except wherein such laws, etc., may affect transmission of government communications or issue of stocks and bonds by such system or systems. **Held,** in an action by the state on the relation of the Attorney General and Board of Railroad Commissioners against several telephone companies, to enjoin them from putting into effect certain threatened tariffs and schedules of intra-state rates, changes· and regulations contrary to the laws of the state, in which action defendants defend under and by virtue of Postmaster General's order made pursuant to said joint resolution and presidential proclamation,—that the term "lawful police regulations" in said proviso is used in its broad sense, which includes the power of rate regulation, and not in its narrow sense as referring simply to the public safety, health and morals; that the power to fix such intra-state rates did not, under such resolution, pass to the President nor to his representative, the Postmaster· General.

**2. Statutes—Federal Act, Congressional Resolution, Re Control, Operation, of Telephone Systems, ·Versus State Laws and Con₁ trol—Federal Proviso, Saving Police Regulations, Doubt Concerning, Construction Favoring State.**

In construing federal laws and congressional resolutions, and in determining whether thereunder Congress intended to deprive the states of power to regulate intra-state telephone message rates, **held,** that it will be presumed that it was known to Congress that, in the nature of things, control of such business would be exercised by the state, and that if Congress deemed that national interests and discharge of duties in behalf of the nation from telephone, etc., corporations demanded exemption from state control, it would have used language clearly expressing such intention; and its silence in this respect is assurance that Congress intended that such business should be subjected to ordinary state control; and it will not be held that Congress intended to supercede or suspend exercise of police powers of the state, even when it may do so, unless such intent is clearly manifest; and any doubt arising on the interpretation of such act or resolution should be resolved in favor of the reserved power of the state. So held, in construing the second proviso in congressional joint resolution of July 16, 1918, empowering the President when deemed necessary for national security ·or defense, to supervise or take possession and assume control and ·operation of any telegraph, telephone, etc., system or systems, for duration of the present war, which proviso provides that nothing in the act shall be construed to amend, or affect, etc., ·existing laws or powers of states relating to taxation or "the

lawful police regulations" of the several states, except wherein such laws, etc., may affect transmission of government communications or issue of stocks and bonds by such system or systems.

3.   Statutes—Federal Resolution re Control, Operation, Of Telephone Systems Versus State Control—Proviso Restricting Resolution re State Powers, Exception in, Construed.

   In construing said proviso in said congressional resolution, wherein it excepts therefrom state laws, etc., affecting issue of stocks and bonds, held, that said proviso removes all doubt as to the intent of Congress; that the power of the state to regulate issuance of stocks and bonds by corporations created under its authority is one entirely foreign to and beyond those powers included in the term "police power," when such term is used in its narrow sense as referring to the power to preserve the public safety, health and morals; therefore, when Congress therein declared that the "police regulations of the several states" left to the states, should not "affect the issue of stocks and bonds" of telegraph, etc., companies; it clearly had in mind reserving to the states such "police regulations" as, if unrestricted, might affect issue of stocks and bonds. Thus Congress, by the wording of said proviso, declared its reservation to the states, subject to two limitations, (i. e. transmission of government communications and issuance of stocks and bonds) of the full police powers the states possess as sovereign states; and said term "lawful police regulation" is therefore self-interpreted by Congress, and needs no judicial interpretation.

4.   Telegraphs and Telephones—Commerce—Intra-state Commerce—Federal Control, Operation, Implying Taking of Revenues, of Intrastate Telephone Companies and Rates, Whether Authorizing Rate-fixing—Proviso in Federal Resolution Construed—Presumption of Fair Intra-Rates.

   Held, further, that defendants' contention that assumption of control and operation implied taking over all revenues by the federal government, and that by reason thereof Congress intended to assume authority to fix interstate and intra-state rates for said companies, is untenable, since it ignores the second proviso, which says nothing concerning taking over revenues; that while contracts between the Postmaster General and the telephone companies are not persuasive of the correct interpretation of the proviso, yet, even if the act contemplates taking over such revenues, that fact is not entitled to weight in construing the proviso; since such fact would not be inconsistent with its dependency on the right of the states to continue regulation of intra-state rates; that each class of rates, established under authority of law, are entitled to presumption that they are fair and reasonable; nor is it inconsistent with

assumption of the revenues for Congress to declare such assumption was subject to reasonable rates lawfully established.

5. **Same — Commerce — Interstate, Intra-state Commerce — Federal Control, Operation of Intra-state Telephone, etc., Systems Whether Properties Taken Over—Railroad Commissioners' Action to Enjoin, Whether Federal Suit—Right to Injunction.**

An action by the state on the relation of the Attorney General and Board of Railroad Commissioners against several telephone companies operated within this state, to enjoin putting into effect certain threatened intra rates, tariffs and schedules, which action was defended under and by virtue of a joint resolution of Congress of July 16, 1918, authorizing presidential action in assuming possession, control, and operation, of telephone, etc., systems, during the present war, a presidential proclamation, and an order of the Postmaster General pursuant thereto, is not an action against the United States, or its property, but is one seeking to restrain commission of an unauthorized act, or one which cannot be maintained in the state Supreme Court because Congress has not given its assent thereto; since even if the property referred to in the resolution, the proclamation and the order, has become property of the United States Government, the Government's title thereto is encumbered by the reserved power of state to regulate intra-state rates, and preserved to the state under the proviso to the resolution. **Held,** further, that when the Postmaster General seeks, under said resolution and proclamation, and his own official order, to promulgate rates, and the defendant telephone companies seek to carry them out in defiance of state laws, they are wrongdoers, and are amendable to the state laws; and the injunction ought to be granted, subject to the right of the Federal Government to transmit government communications, and to issue of stocks and bonds by defendants or either of them.

McCoy, J., and Smith, P. J., dissenting.

Original action by the State of South Dakota, on the relation of Byron S. Payne, as Attorney General, and John J. Murphy, and P. W. Dougherty, as and constituting the Board of Railroad Commissioners of the State of South Dakota, against the Dakota Central Telephone Company, a corporation, and others, to enjoin the defendants from putting into effect certain tariffs and schedules of rates, changes and regulations governing transmission of long distance intrastate telephone messages. Injunction granted, with certain restrictions.

*Byron S. Payne,* Attorney General, *Oliver E. Sweet,* Assistant Attorney General, and *P. W. Dougherty,* for Plaintiffs.

*Null & Royhl, Edgar M. Morsman, Jr., E. A. Prendergast,* for Defendants, *R. P. Stewart,* United States Attorney for District of South Dakota, for the Federal Government.

(1) Under point one of the opinion, Plaintiffs submitted that: With reference to this resolution: first, that Congress has no power or authority which it can exercise itself, or which it can delegate to the President, to control those internal affairs of the state which are subject to its police powers; second, that even if Congress possesses such power and authority, it did not delegate same to the President by said resolution; but, on the other hand, by the concluding proviso, Congress expressly recognized the power and authority of the state to control the intrastate rates of telegraph and telephone companies, through its lawful police powers; and cited:

Wis. ex rel., Attorney General, v. C. & N. W. Ry. Co., et al, 35 Wis. 425, 559; Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Arkansas Rate Cases, 187 Fed. 290; Williams v. Arkansas, 108 S. W. 838, 26 L. R. A. (N. S.) 482; Reagan v. Mercantile Trust Company, 158 U. S. 413, 38 L. Ed. 1028; 3 Bouvier's Law Dictionary, page 2808; Freund on Police Power, pages 65, 378, 385; IX Encyclopedia United States Supreme Court Reports, pages 540, 541; Minnesota Rate Cases, 230 U. S. 352, 57 L. Ed. 1511; Railroad Commission Cases, 116 U. S. 307, 29 L. Ed. 636.

(3) Under point three, Plaintiffs submitted that:

Congress did not, by said resolution, take away from the State of South Dakota the regulation of intrastate telephone rates, under its police powers; and cited:

Wisconsin, ex rel., Attorney General, v. Chicago & North Western Railway Company, et al, 35 Wis. 425, 591; Cooley's Constitutional Limitation, 577; 31 Cyc. 903; Fuller on Interstate Commerce, 17.

(5) To point five, Plaintiffs cited:

Noble v. Railroad Company, 147 U. S. 165, 13 Sup. Ct. Rep. 271; Caldwell v. Robinson, 59 Fed. 653; American School of M. H. v. McAnnulty, 187 U. S. 94; Louisiana Board of Liquidation v. McComb, 92 U. S. 531, 541; Vol. I, Joyce on Injunctions, Sec. 350.

Defendants submitted that:

The question whether the United States, or a state, is a party

to the controversy is not determined by the merely nominal party on the record, but by the question of the effect of the judgment or decree which can be entered; and cited:

Minnesota v. Hitchcock 185 U. S. 373, 387; Re Ayres, 123 U. S. 443, 502; Haygood v. Southern 117 U. S. 52; 29 Law Ed. 805; Louisiana v. Jumel 107 U. S. 726; 27 Law Ed. 448; Cunningham v. Macon 109, U. S. 446; 27 Law Ed. 992; Murray v. Distilling Co., 213 U. S. 151; 53 L. Ed. 742; Smith v. Reeves 178 U. S. 436; 44 Law Ed. 1140; Fitts v. McGee, 172 U. S. 516; 43 Law Ed. 535. That this action is one against the United States; citing:

Carr v. United States, 98 U. S. 433, 437; Stanley v. Schwalby 147 U. S. 513; 162 U. S. 255; Belknap v. Schild 161 U. S. 12, 16, 19. That:

This resolution was an exercise of a lawful war power by Congress. It related to a subject confided exclusively to Congress by the Federal Constitution. The successful conduct of the war was confided to Congress and this resolution was a part of the enactments of Congress to successfully carry the war to completion. The proclamation of the President and the act of the Postmaster General pursuant thereto were in fulfillment of this National Legislation.

GATES, J. This is an original action brought by the state, on the relation of the Attorney General and Board of Railroad Commissioners, against four telephone companies operating in South Dakota, viz. the Dakota Ceneral Telephone Company, the Northwestern Telephone Exchange Company, the Nebraska Telephone Company, and the South Dakota State Telephone Company. The complaint alleged, in substance, that the defendants threatened, and were about to put into effect certain tariffs and schedules of rates, charges, and regulations governing the transmission of long-distance telephone messages between points wholly within the state, contrary to and without compliance with, the laws of this state in that behalf, and sought injunction. The answer of the defendants admitted the substantial allegations of the complaint, but alleged that they were proceeding in accordance with order No. 2495, issued by the Postmaster General of the United States on December 13, 1918, referred to as Bulletin 22, made pursuant

30—Vol. 41, S. D.

to the joint resolution of Congress of July 16, 1918 (U. S. Comp. St. 1918, § 3115¾x), and the proclamation of the President of the United States of July 23, 1918. The cause was submitted for judgment upon the pleadings.

Much has been said in the briefs about the war powers of Congress and of the President, but we are of the opinion that those questions are beside the issues of this case. In our opinion the determination of this case depends entirely upon the meaning of the second proviso in the joint resolution of July 16, 1918. The parts of the resolution material to this case are as follows:

"That the President during the continuance of the present war is authorized and empowered, whenever he shall deem it necessary for the national security or defense, to supervise or to take possession and assume control of any telegraph, telephone, marine cable, or radio system or systems, or any part thereof, and to operate the same in such manner as may be needful or desirable for the duration of the war. * * *

"Provided, that just compensation shall be made. * * *

"Provided further, that nothing in this act shall be construed to amend, repeal, impair, or affect existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transmission of government communications, or the issue of stocks and bonds by such system or systems."

[1] It is contended by plaintiff that the term "lawful police regulations" is there used in its broad sense, which includes the power of rate regulation. Chesapeake & Potomac Telephone Co. v. Manning, 186 U. S. 238, 22 Sup. Ct. 881, 46 L. Ed. 1144. It is contended by the defendants that such term is there used in its narrow sense as referring simply to the public safety, health, and morals.

Leaving out of consideration for the moment the two exceptions mentioned therein, we may observe that if by that proviso the Congress intended that the states should continue to exercise their undoubted powers to reasonably regulate the intrastate rates and charges of telephone companies, then the power to fix such rates did not pass to the President nor to his representative, the Postmaster General. If by that proviso Congress intended to deprive the states of the power to regulate rates for

intrastate messages, then, but not until then, we would have to consider the power and authority of Congress so to do.

In our opinion Congress intended the former. The act and the proviso should be so construed unless the contrary clearly appears. The contrary should not be assumed by mere implication.

[2] In Reagan v. Mercantile Trust Co., 154 U. S. 413, 14 Sup. Ct. 1060, 38 L. Ed. 1028, the court said:

"It must have been known that, in the nature of things, the control of that business would be exercised by the state, and if it deemed that the interests of the nation and the discharge of the duties required on behalf of the nation from this corporation demanded exemption in all things from state control, it would unquestionably have expressed such intention in language whose meaning would be clear. Its silence in this respect is satisfactory assurance that, in so far as this corporation should engage in business wholly within the state, it intended that it should be subjected to the ordinary control exercised by the state over such business."

In Reid v. People of the State of Colorado, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108, the court said:

"It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the states, even when it may do so, unless its purpose to effect that result is clearly manifested."

[3] So that, if the clause in the proviso is ambiguous and needs interpretation, the doubt should be resolved in favor of the reserved power of the state. But a consideration of the second exception in the proviso removes, in our opinion, all possible doubt as to the intention of Congress. The material parts of the proviso applicable to the point in question are:

"Nothing in this act shall be construed to amend, repeal, impair, or affect * * * the lawful police regulations of the several states, except wherein such * * * regulations may affect the * * * issue of stocks and bonds by such system or systems."

It cannot be doubted that the power of a state to regulate the issuance of stocks and bonds by corporations created under its authority is a power entirely foreign to and outside of those powers included in the term "police power" when such term is used in its narrow sense as referring to the power to preserve

public safety, health, and morals. Therefore, when Congress declared that the "police regulations of the several states" left to the states should not "affect the issue of stocks and bonds" of telegraph and telephone companies, it is clear that it had in mind reserving to the states "police regulations" which, if unrestricted, might affect the issue of stocks and bonds. Thus Congress has, by the very wording of this proviso, declared that it reserved to the states, subject to two limitations, the full police powers that the states possess as sovereign states. The term "lawful police regulations" is therefore self-interpreted by Congress and needs no interpretation by the courts.

[4] It is further urged that the assumption of control and operation imply the taking over of all revenues, and that by reason of the taking over of the revenues of the companies Congress intended to assume authority to fix all rates, interstate and intrastate. That contention ignores the second proviso of the resolution. The resolution says nothing about the taking over of the revenues. The provisions of the contracts entered into between the Postmaster General and the telephone company are not persuasive of the correct interpretation of the proviso; but, even if the act does contemplate the taking over of all revenues, interstate and intrastate, that fact is not entitled to weight in construing the terms of the proviso, because that fact would not at all be inconsistent with its dependency on the right of the states to continue to regulate intrastate rates. Intrastate rates, as well as interstate rates, established under the authority of law are entitled to the benefit of a presumption that they are fair and reasonable. How can it be said to be inconsistent with the assumption of the revenues for Congress to declare that such assumption was subject to the reasonable rates lawfully established?

[5] It is further urged that, by the several steps taken by Congress, by the President, and by the Postmaster General, the properties taken over have become the properties of the United States government unshackled from state authority, and that this action is in reality one against the United States, which cannot be maintained in this court because Congress has not given its assent thereto. The answer is that, even if the property has become the property of the United States government, the government's title thereto is incumbered by the reserved power of the

state to regulate intrastate rates. When, therefore, the Postmaster General seeks to promulgate rates, and the defendant telephone company seeks to carry them out, in definance of the state laws, they are wrongdoers, and are amenable to the laws of this state. The action is not one against the United States or its property, but is one seeking to restrain the commission of an unauthorized act.

In the Minnesota Rate Cases the Supreme Court of the United States very fully went into the question of what were and what were not suits against the state. Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764. That decision is authority for the position which we assert.

We are of the opinion that the injunction sought should be granted, but that it shall provide that it in no wise affects the transmission of governmental communications or the issue of stocks and bonds by the defendants or either of them.

McCOY, J. (dissenting). For reasons hereafter stated I am unable to concur in the majority opinion. The majority opinion states that:

"Much has been said in the briefs about the war powers of Congress and of the President, but we are of the opinion that those questions are beside the issues in this case."

All the decisions and authorities cited by the majority are applicable only to ordinary normal peace conditions. As I view the situation, in the interpretation of the said resolution and the effect of the proviso therein, my Associates have entirely lost sight of the fact that we have been and now are engaged in a war, and that the President and Postmaster General have been and now are exercising discretionary executive war power for the common defense of our country. The whole meat of the interpretation of said resolution should be based upon the war powers of Congress, and the purposes, spirit, and intent, and the object and ends sought to be accomplished by its enactment. 36 Cyc. 1110. Much of the argument of plaintiffs, as disclosed by their briefs, is to the effect that the war, for all legal purposes, closed with the signing of the armistice on November 11, 1918. The resolution of Congress in question expressly provides that the government may retain possession and control of such telephone

systems until the ratification of peace treaties shall have been proclaimed by the President. We should take judicial notice that no such treaties yet have been proclaimed. Aside from the provisions of the resolution, the general common-law rule seems to be that it is the province of the political and not the judicial department of government to determine when war, as a legal status binding upon the courts, commences and ends; that courts cannot take judicial cognizance of the fact that war has commenced or ended until there has been some act or declaration by that department of government clothed with war-making power. Conley v. Calhoun Co., 2 W. Va. 416; Bishop v. Jones, 28 Tex. 319; United States v. Palmer, 3 Wheat. 610, 4 L. Ed. 471; 40 Cyc. 393. As a matter of notorious common knowledge we should take judicial notice that at the present time no proclamation declaring war at an end has been made by the President or other political department of our federal government clothed with such power. We should also take judicial notice that this nation now has on foreign soil a large army; that it is now being supplied at enormous cost; that it is as essential now as before the armistice that our government have funds necessary to care for its army, transport the same home, and demobolize the same in orderly course. Revenues and other war service equipment are as necessary now as before the armistice.

It will be observed that the resolution of Congress, partially quoted in the majority opinion, in substance provided that the President, during the continuance of the present war, was authorized and empowered, whenever he should deem it necessary for national security or national defense, to take possession and control of any telephone or telegraph systems and operate the same in such manner as might be needful. Needful for what? The only answer is for war purposes. On July 22, 1918, acting under said resolution, the President by proclamation took over into war service the possession and control of each and every telephone system within the jurisdiction of the United States, and placed them under the immediate supervision and control of the Postmaster General, who was thereby authorized and empowered to act in the premises for and on behalf of the President. Thereafter, on July 31, 1918, the President, acting by and through the Postmaster General, took actual physical possession and control of

all said telegraph and telephone systems, including the properties theretofore owned, controlled, and operated by the defendants within this state, and from thence thereafter the possession, control, and operation of said telephone systems have been and now are under exclusive federal control, and defendants have not now any pecuniary interest in the revenues, disbursements, profits, or losses of said defendant corporations. Thereafter, on December 13, 1918, the Postmaster General, by order, prescribed the intrastate rates to be in force during the period of federal control on all telephone systems, including those of defendants, which materially increased the intrastate rates theretofore existing within this state. The defendants claim that they intend to apply said proposed intrastate rates only because ordered and directed so to do by the Postmaster General. In promulgating and establishing said order prescribing said increased intrastate rates, the President, through the Postmaster General, claims to be exercising an executive discretion legally confided in him by the laws of the United States, during the war, as a war measure, and which discretion is not subject to judicial control or interference, and to all which the powers and authorities of the several states and their officers are subordinate. By said resolution, it clearly appears that discretionary executive power was confided in the President to take over for war purposes the entire system of the telephone corporations, including the appurtenant rights to fix rates of compensation that should be paid by the public for service or use thereof; in other words, the President, if he deemed it needful, was empowered to impress into war service, not only the entire equipment, property, officers, agents, and employees of said corporations, but also the use and revenues thereof, and any and all other means of every nature appertaining to and possessed by said telephone systems, whereby the common defense of the country might be benefited and made more secure. When said telephone systems were taken over by the government for such war purposes, incidentally, and as an inherent part thereof, the capacity of said systems to produce revenues was also taken over to be used by the President as he might deem needful for common defense. The power of impressment is defined to be that possessed by a government in taking persons or property to aid in defense of the nation with or without the consent of the persons concerned. In

this instance, after said taking, many of the telephone corporations consented to the said impressment into war service by contracts made with the government, while some did not consent thereto; but whether such corporations so consented or not, the effect of the taking over was the same in either case. The impressment into such war service of the use, and the means to thereby obtain revenues from the public, were just as needful and as essential for war purposes as any other use to which the government might desire to put said telephone systems. From the time of so taking over of said telephone systems they became to all legal intents and purposes the same as if the government of the United States was and always had been the sole and absolute owner thereof, together with all the incident appurtenant powers of such ownership. When they were so taken over they became completely unshackled from state authority, and thereafter neither the state nor its board of railway commissioners had any further power or jurisdiction over the same, any more than they had over any other solely owned, operated, and controlled federal property. When said telephone systems so went into the hands of the Postmaster General, the same and all their various powers and functions ceased completely to be subject to the police power of this state, otherwise the federal government might thereby be hindered and delayed in what it deemed proper and needful war purpose measures. The laws of this state relating to the fixing of intrastate telephone rates never did, and do not now, apply to United States owned, operated, and controlled property. The fact of so taking over said telephone systems and the fixing of increased intrastate rates in no manner conflicts with, repeals or impairs the force and effect of the police power of this state, but such taking over had the effect of removing said systems entirely out of and from under the jurisdiction of the state civil law. The state civil law is as effective now as ever as to property and persons over which it has jurisdiction, but property which has passed under the military jurisdiction of the President is not a subject of police regulation under the state civil law. If Federal Selective Draft Act, May 18, 1917, c. 15, 40 Stat. 76 (U. S. Comp. St. 1918, §§ 2044a-2044k), had contained a proviso that nothing in that act should be construed to amend, repeal, or impair or affect existing laws or power of the states in lawful police regulation, could any one successfully

contend that individuals who had been drafted into war service, on the eve of battle or embarkation, might be imprisoned for violating some civil state police regulation; would it not be held that the drafted person had been taken out of the jurisdiction of the civil law, and, for the time being, made amenable only to military law; that no state law had been thereby repealed or impaired as to persons not drafted into federal war service—would it not be properly held that any other holding would thwart, hinder, or delay the very war object for which the soldier had been impressed or drafted into service? Now the government has impressed private property for the same war purposes. Is it not for the executive department, whose duty it is to prosecute the war, to determine what particular use shall be made of the impressed private property just the same as it may determine when use shall be made of the impressed soldier? Efficient war service was the purpose—the primary object for which the said resolution of Congress was enacted. It authorized the complete taking over of telephone systems. After the same were so taken over it was the province and the duty of the executive department, clothed with power to prosecute the war, to determine what war purpose use should be made thereof. If such executive department in its discretion determined that it was a necessary and needful war measure to increase the intrastate rates, it was within its executive discretion to do so, otherwise the very war object for which it was taken over might be hindered and delayed and entirely thwarted by civil law courts. The power to determine what use or purpose should be made of said telephone systems and whether or not this thing, that, or the other was a proper war measure was within the discretionary military executive jurisdiction of the President as commander-in-chief of the army and navy. When discretionary military power to take over telephone systems, as a part of the process of conducting the war, was so placed in the hands of the President, it then became his lawful province to interpret those powers. Now, in interpreting and construing said power the President, through the Postmaster General, has decided and determined that the said increase in intrastate telephone rates is a proper war measure. I am of the view that such interpretation is supreme and paramount to any other interpretation that might be made by any civil court. It seems to

be well settled that when a state of war exists the exercise of discretionary military power and authority cannot be controlled or interfered with by civil courts, unless where it is clearly made to appear that the acts, assumed to be done by virtue of such military power, are in excess and entirely outside of any reasonable military purpose for which the power was given or might be exercised. State v. Burton (R. I.) 103 Atl. 962, L. R. A. 1918F, 559; In re Wulzen (D. C.) 235 Fed. 362, Ann. Cas. 1917A, 274; Druecker v. Salomon, 21 Wis. 631, 94 Am. Dec. 571; Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60. Within its sphere each particular department of the federal government, legislative, executive, and judicial, is supreme and paramount. In re Quarles, 158 U. S. 535, 15 Sup. Ct. 959, 39 L. Ed. 1080. These telephone systems having become, during the period of the war, federal property, in the hands and under the control of the executive department, the decisions of that department with reference thereto are paramount to that of any other department. In speaking of the exercise of authority essential to be exercised in relation to the common defense, at the time of the creation of our federal Constitution, Hamilton most appropriately said:

"The authorities essential to the common defense are these: To raise armies; to build and equip fleets; to prescribe rules for the government of both; to direct their operations; to provide for their support. These powers ought to exist without limitation, because it is impossible to foresee or define the extent and variety of national exigencies, or the correspondent extent and variety of the means which may be necessary to satisfy them. The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. This power ought to be coextensive with all the possible combinations of such circumstances, and ought to be under the direction of the same councils which are appointed to preside over the common defense." 10 Fed. Stats. Ann. (2d. Ed.) p. 300.

Under well-known general rules statutes should be construed in the light of, and so as to give full force and effect to, the purposes and objects which brought about their enactment.

"Every statute must be construed with reference to the object

intended to be accomplished by it. In order to ascertain this object it is proper to consider the occasion and necessity of its enactment, * * * and the statute should be given that construction which is best calculated to advance its object." 36 Cyc. 1110.

The President having been authorized to completely take over said telephone systems for military purposes, it would seem to necessarily follow that he alone, as the person appointed to preside over the common defense, should determine what war uses should be made thereof. I am of the view that the general rule announced by this court in State v. Express Co., 170 N. W. 570, to the effect that an executive officer of state, such as the President or Governor, is not subject to the control or interference of the judiciary in the performance of discretionary duties belonging to him as such officer, and that no act done or threatened to be done by him in his official executive capacity can be brought under judicial control or interfered with by mandamus or injunction.

Therefore I am of the view that the application of plaintiffs for injunction should be denied.

SMITH, P. J., concurs in this dissent.