State ex rel. Blaine v. Wisconsin Tel. Co. 169 Wis. 198.

charge her separate estate.     In my opinion the verdict is not supported by the evidence and the judgment should be reversed.

ROSENBERRY and OWEN, JJ.   We concur in the foregoing opinion of Mr. Justice SIEBECKER.

STATE EX REL. BLAINE, Attorney General, vs. WISCONSIN
TELEPHONE COMPANY.

*March 8—April 29, 1919.*     •

*Federal control of telegraphs and telephones: Congressional resolution: "Possession:" "Control:" "Operation:" "Police regulation:" Suits against United States officers and agents: Use of property: Torts: Personal liability: Injunction: Suits against United States: Consent: Constitutional law: Police power. ·*

1. The term "police power," in its limited sense, includes simply regulations for the protection of the lives, health, and property of citizens and the promotion of good order and good morals.
2. A Congressional resolution authorizing the President "to supervise or to take possession and assume control of" and "operate" any telegraph or telephone system for the duration of the war, and providing that the resolution should not be construed to affect the police regulations of the state, is *held* to authorize the fixing of intrastate rates, the words "possession," "control," and "operation" importing absolute power over the subject without interference, and "police regulations" referring merely to regulations to insure the lives, health, and welfare of the public and the employees.
3. Where the United States by its officers is rightfully in possession of property and is using it in governmental operations, such use is not to be interfered with by injunctions or other writs issued out of state courts in actions brought against such officers.
4. The sovereign cannot be sued except with its own consent and in courts of its own choice.
5. United States officers or agents may be held personally liable in actions of tort to private persons whose rights of person or property have been wrongfully invaded or injured while acting under the authority of the United States.

6. United States officers or agents may be enjoined from carry-
ing out a threat to wrongfully invade or injure rights of
property of private persons while acting under the authority
of the United States.

ESCHWEILER and OWEN, JJ., dissent.

THIS IS an action by the state, brought originally in this
court on relation of the attorney general, to permanently en-
join the defendant company from charging higher rates for
intrastate messages than the rates fixed by the railroad com-
mission of the state on September 1, 1907.   The company,
which controls eighty per cent. of the long-distance telephone
business in the state, answered alleging that on July 31,
1918, the President of the United States took full control
and possession of its lines, pursuant to a joint resolution of
Congress authorizing such action in the exercise of the war
power, and that the increased rates in question were fixed by
the postmaster general, acting for the President, January 21,
1919, and that in operating its telephone lines it was simply
acting as the agent of the United States and was not operat-
ing the same as a public utility.

Both parties moved for judgment on the pleadings, from
which it appears, among other things, that by joint resolu-
tion of Congress passed July 16, 1918, the President was
authorized during the continuance of the war, whenever he
deemed it necessary for the national security or defense, "to
supervise or to take possession and assume control" of any
telegraph or telephone system or any part thereof and "to
operate the same in such manner as may be needful or de-
sirable" for the duration of the war, but not beyond the date
of the President's proclamation announcing the ratification
of the treaty of peace, just compensation being required for
such use; the resolution also providing that nothing therein
should be construed "to amend, repeal, impair, or affect ex-
isting laws or powers of the states in relation to taxation or
the lawful police regulations of the several states except
wherein such laws, powers, or regulations may affect the

transmission of government communications or the issue of stocks and bonds by such system or systems."

It further appears from the pleadings that the President, by proclamation on July 22, 1918, announced that he thereby took possession and assumed control and supervision of each and every telegraph and telephone system in the United States with all equipment, material, and supplies, and that the "supervision, possession, control, and operation" of such system should be exercised by and through the postmaster general, who was authorized to perform his duties through the owners, managers, officers, and employees of the system so long and to such extent and manner as he should determine. Possession was actually taken July 31, 1918, and the defendant's system has since that time been operated by its officers and employees as the agents of the government. A general raise in the rates of all messages was made January 21, 1919, by direction of the postmaster general, and this action is brought to enjoin the company from charging such increased rates or any rates in excess of the rates fixed by the railroad commission September 1, 1907.

*John J. Blaine,* attorney general, and *M. B. Olbrich,* deputy attorney general, for the relator.

For the defendant there was a brief by *Miller, Mack & Fairchild* of Milwaukee, attorneys, and *Eugene S. Wilson* of Chicago, of counsel, and oral argument by *Edwin S. Mack.*

A brief on special appearance for the United States was filed by *H. W. Sawyer* of Milwaukee and *A. C. Wolfe* of La Crosse, United States district attorneys, and *B. R. Goggins* of Grand Rapids, special assistant to the United States attorney general; and the cause was argued orally by *Mr. Sawyer, Mr. Wolfe,* and *Mr. Goggins.*

WINSLOW, C. J. A number of very important and interesting questions were debated in the present case with ability and force. We shall not attempt to discuss them all in this

opinion.    Most if not all of them will doubtless be presented
to the supreme court of the United States in the near future
and will there receive comprehensive treatment, and, as that
court speaks the final word on all such subjects, it seems that
it would be a work of supererogation for this court to write
at length upon them now.    We feel, however, that when so
much labor and ability have been expended in the prepara-
tion and argument of a case involving such serious questions,
it is only fair that the bench should with promptness respond
to the effort made by counsel and meet the issue fairly and
squarely instead of evading it.    This course seems not only
to be the dignified course, but the course demanded by the
public interest, and we have concluded, therefore, to briefly
state our conclusions on several propositions which seem to
us controlling in this case.

There is no question as to the authority of the United
States, by virtue of its exclusive war power, to take over and
operate the telegraph and telephone lines of the country in
time of war.

Without seriously questioning this proposition, the state
contends that the power to prescribe rates is a police power
and, being such, is specifically reserved to the states by the
proviso at the close of the joint resolution of Congress which
specifically says that the laws and powers of the states in
relation to taxation or lawful police regulations are not
amended, repealed, impaired, or affected.

The term "police power" is very elastic and is used to ex-
press different meanings at different times.    In its broadest
sense it has been said to include "all legislation and almost
every function of civil government."    *Sligh v. Kirkwood,*
237 U. S. 52, 59, 35 Sup. Ct. 501.    In its limited sense and as
more frequently used, it includes simply regulations "for the
protection of the lives, health, and property of citizens and
the promotion of good order and good morals." *Chicago, M.
& St. P. R. Co. v. Milwaukee,* 97 Wis. 418, 72 N. W. 1118.
It is police power in this limited sense which the federal su-

preme court grants to the states in cases where its exercise affects interstate commerce. Freund, Police Power, § 10. It is in this limited sense, also, that the term is used when it is said in our own decisions and in the decisions of the United States courts that the police power of the state cannot be bargained away either by the legislature or by municipal corporations. *Superior v. Roemer,* 154 Wis. 345, 141 N. W. 250; *Stone v. Mississippi,* 101 U. S. 814; *Northern Pac. R. Co. v. State ex rel. Duluth,* 208 U. S. 583, 28 Sup. Ct. 341.

This must be so from the fact that the courts hold that a city may lawfully make a contract which is binding on itself governing rates to be charged by a public utility for its service. *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925; *Detroit v. Detroit C. St. R. Co.* 184 U. S. 368, 22 Sup. Ct. 410. It could not do so if the rate-making power were a police power within the meaning of that term as used in the cases first above cited.

The question here is whether the term is used in its broadest sense or in its limited and perhaps ordinary sense in the Congressional resolution. Looking at the purposes to be accomplished and the context, we think it is clear that the term was used in its limited sense. "To take possession . . . assume control . . . and to operate" are broad and sweeping terms. Possession, control, and operation naturally import absolute power over the subject without interference from others. Control without the power to fix rates is not real control. Unquestionably the government could exclude every private user if such course were deemed necessary for war purposes. If it could exclude all private users it would seem to follow that it may determine on what terms private persons may be allowed to use the lines. *Pro hac vice* the telephone lines belong to the government and are part of the enginery with which the war is to be won. It seems unthinkable that the government should deliberately surrender to state agencies in forty-eight states and to municipal agen-

cies in many cities the power to prescribe on what terms private persons might use government property. We acquit Congress of this absurd intention. The police regulations referred to in the proviso are undoubtedly such regulations intended to insure the lives, health, moral and physical welfare and good order of the public and of the employees as the state may see fit to prescribe.

There are other considerations which seem to us equally conclusive against the maintenance of this action by the state.

The principle has been very definitely settled by the federal supreme court that when the United States by its officers is rightfully in possession of property and is using the same in governmental operations, such use is not to be interfered with by injunctions or other writs issued out of state courts in actions brought against such officers or agents. The reason is that such actions are, in effect, actions brought against the sovereign, and the sovereign cannot be sued except with its own consent and in courts of its own choice. *Belknap v. Schild,* 161 U. S. 10, 16 Sup. Ct. 443; *International P. S. Co. v. Bruce,* 194 U. S. 601, 24 Sup. Ct. 820; *Wells v. Roper,* 246 U. S. 335, 38 Sup. Ct. 317.

If such actions were to be maintained and injunctive relief granted, the result would be either that the sovereign would be practically coerced in an action to which it was not a party, or that the sovereign would disregard the *brutum fulmen* of the trial court and render the decree nugatory and ridiculous. In the present case, if the injunction were to be granted, all that the government would have to do would be to place another set of servants in possession of the telephone system and proceed to operate it as before. The right of the government is not to be interfered with behind its back. *International P. S. Co. v. Bruce, supra.* This does not mean that United States officers or agents may not be held personally liable in actions of tort to private persons whose rights of person or property they have wrongfully invaded

or injured while acting under the authority of the United States. *Belknap v. Schild, supra.* Nor does it mean immunity from injunctive process on the part of such officer in case of threatened injury to property rights. *Philadelphia Co. v. Stimson,* 223 U. S. 605, 32 Sup. Ct. 340.

The principles stated are decisive of the present case. If they are necessary in time of peace they are tenfold more so in time of war. The plight of a government which must submit the control of any essential branch of its war activities to another government is serious indeed. It cannot expect to escape disaster, for successful war means practically absolutism for the time being.

We have received since the argument of the case the recently rendered opinions of four courts of last resort in dealing with similar cases, viz.: *Railroad Comm. v. Cumberland, etc. Co.* (La.) 82 South. ——; *Southwestern, etc. Co. v. Oklahoma* (Okla.) 181 Pac. 487; *Public Service Comm. v. New England T. & T. Co.* (Mass.) 122 N. E. 567; *State v. Burleson* (Ala.) 82 South. ——; and *State ex rel. Payne v. Dakota Cent. Tel. Co.* (S. Dak.) 171 N. W. 277. Of these decisions the first four support the conclusion reached in this opinion, while the last is to the contrary. We have been furnished with opinions of several *nisi prius* courts, state and federal, the majority of which support the view here taken. We are satisfied that the injunction should be denied.

*By the Court.*—Complaint dismissed, without costs.


ESCHWEILER, J. (*dissenting*). The defendant in this case is a Wisconsin corporation owing its existence and right to do business within this state to its charter obtained from this state. The rates heretofore published for service between points within the state of Wisconsin having been so fixed and established by the railroad commission, have the force, not only of contractual obligations between the defendant and its Wisconsin patrons, but of statutory obligations. *Pennsylvania R. Co. v. International C. M. Co.* 230

U. S. 184, 197, 33 Sup. Ct. 893; *New York, N. H. & H. R. Co. v. York & Whitney Co.* 215 Mass. 36, 40, 102 N. E. 366.

The defendant asserts here that it is changing such established rates by virtue of an order given to it so to do by the postmaster general of the United States. If there is sufficient authority in such official to issue such a command it is a perfect defense for the defendant and ends the matter. If there is no such power in that officer there is no valid defense asserted, and this court, having jurisdiction over a corporation created by and existing under the laws of the state of Wisconsin; has power and authority to determine and declare such absence of a valid defense. This court does not thereby assume control or jurisdiction over any branch of the federal government or officer thereof or in any manner show any want of proper respect to the federal government.

The making or changing of such rates is primarily a legislative function. *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 161, 116 N. W. 905; *Milwaukee E. R. & L. Co: v. Railroad Comm.* 238 U. S. 174, 180, 35 Sup. Ct. 820; *Louisville & N. R. Co. v. Garrett,* 231 U. S. 298, 307, 34 Sup. Ct. 48.

There is no express delegation by the joint resolution here involved of such legislative function. If it is to be implied it should be clear and beyond reasonable question. *Cochnower v. U. S.* 248 U. S. 405, 407, 39 Sup. Ct. 137.

I can see, therefore, no ground upon which it could be safely asserted that Congress intended by this joint resolution to place the rate-making power as to telephone service, either interstate or intrastate, in the control of the President or in any one whom he might choose to appoint.

The proviso in the joint resolution reads:

"That nothing in this act shall be construed to amend, repeal, impair, or affect existing laws or powers of the state in relation to taxation or *the lawful police regulations* of the several states, except wherein such laws, powers, or regulations may affect the transmission of government communica-

tions, or the issue of stocks and bonds by such system or systems."

It is held by the majority opinion that the change in rates made by the order of the postmaster general of January 21, 1919, is not within the term "lawful police regulations" of the proviso.

On January 7, 1919, in the case of *Union D. G. Co. v. Georgia P. S. Corp.* 248 U. S. 372 (39 Sup. Ct. 117), the United States supreme court said as follows (p. 374):

"Capital invested in an electric light and power plant to supply electricity to the inhabitants of a city is devoted to a use in which the public has an interest which justifies *rate regulation* by a state in the exercise of its *police powers.*"

There can be no valid distinction between the fixing of telephone rates and those for electric lighting.

I think such a definition of police power by the federal tribunal should be conclusive on us here when construing the term in the proviso in question, and that we should indulge in the assumption that when the legislative branch of the federal government used the same phrase in the joint resolution they meant the same thing.

The change cannot be justified as an exercise of police power. Police power belongs to the states. It has never been surrendered to the federal government, and that government as such has no police power. *Keller v. U. S.* 213 U. S. 138, 145, 149, 29 Sup. Ct. 470; *House v. Mayes,* 219 U. S. 270, 282, 31 Sup. Ct. 234; *Hammer v. Dagenhart,* 247 U. S. 274, 275, 38 Sup. Ct. 529; *U. S. v. Doremus,* 249 U. S. 86, 39 Sup. Ct. 214.

I cannot see that the defendant has met the burden of showing proper authority for the postmaster general to make the order of which complaint is made. The determination of some particular officer that he has the power he asserts is not controlling.

"Neither the silence of Congress nor decisions of officers of the United States have any authority beyond the domain

established by the constitution." *Weigle v. Curtice Bros. Co.* 249 U. S. 285, 39 Sup. Ct. 124.

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." *U. S. v. Lee,* 106 U. S. 196, 220, 1 Sup. Ct. 240.

The right of possession by the postmaster general of the telephone system is no more disturbed by requiring the defendant company to continue its law-fixed rates than was his possession interfered with when the system was conducted under the old rates before the order of January 21st, or than it is, because he cannot set aside the state laws as to taxation. It may affect the revenue, but this is not a revenue measure. The application here does not seek to take away anything now in the possession of the federal government as in the cases cited in the majority opinion, *Belknap v. Schild,* 161 U. S. 10, 16 Sup. Ct. 443; *International P. S. Co. v. Bruce,* 194 U. S. 601, 24 Sup. Ct. 820, or the breaking of a contract as in *Wells v. Roper,* 246 U. S. 335, 38 Sup. Ct. 317. It challenges the authority asserted by an official who, if within his authority, may be immune from judicial control, but if he attempts to act without his lawful jurisdiction is as amenable to the courts as is the humblest citizen. *Philadelphia Co. v. Stimson,* 223 U. S. 605, 620, 32 Sup. Ct. 340; *Waite v. Macy,* 246 U. S. 606, 610, 38 Sup. Ct. 395; *Gegiow v. Uhl,* 239 U. S. 3, 9, 36 Sup. Ct. 2; *Lane v. Watts,* 234 U. S. 525, 540, 34 Sup. Ct. 965; *Degge v. Hitchcock,* 229 U. S. 162, 33 Sup. Ct. 639; *School of Magnetic Healing v. McAnnulty,* 187 U. S. 94, 110, 23 Sup. Ct. 33; *Noble v. Union River L. R. Co.* 147 U. S. 165, 172, 13 Sup. Ct. 271.

I think the prayer of the petition should be granted.

I am authorized to state that Mr. Justice OWEN agrees with me in this dissent.